# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| DIAGEO NORTH AMERICA, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:17-CV-04259-LLS |
| W.J. DEUTSCH & SONS LTD.<br>d/b/a DEUTSCH FAMILY WINE<br>& SPIRITS, and BARDSTOWN BARREL<br>SELECTIONS LLC | ) | |
| Defendants. | ) | |

## EXPERT REPORT OF GARY D. KRUGMAN

1.      I have been retained by W.J. Deutsch & Sons Ltd. d/b/a Deutsch Family Wine & Spirits, and Bardstown Barrel Selections LLC ("Defendants") to offer my opinions in connection with certain trademark related issues raised in Case No. 1:17-CV-04259-LLS now pending in the U.S. District Court for the Southern District of New York.  My opinions are based on my experience as a former Trademark Examining Attorney, a former Administrative Trademark Judge with the Trademark Trial and Appeal Board, and my familiarity with trademark law as more fully noted below.

## I.      QUALIFICATIONS

2.      I received a Bachelor of Science Degree (B.S.) from the State University of New York at Albany, Albany, New York in June, 1969 and a Law Degree (J.D.) from Case Western Reserve University School of Law in Cleveland, Ohio in June, 1973.

3.      After passing the Bar Examination in the District of Columbia in 1973, I was admitted to the District of Columbia Court of Appeals on December 7, 1973.

4.      From 1974 through 1978, I was an Examining Attorney in the Trademark Examining Operation of the U.S. Patent and Trademark Office (PTO).  As an Examining Attorney, I reviewed applications for trademark registration, both for inherent registrability and for conflicts with existing registrations and earlier filed pending applications.

5.      In 1978, I was appointed to the position of Attorney Examiner at the Trademark Trial and Appeal Board (TTAB or Board).

6.      In 1982, I was appointed to the TTAB as an Administrative Trademark Judge and I served in that capacity until August, 1989.

7.      The TTAB is the Administrative Trademark Court of the Patent and Trademark Office and the TTAB Administrative Trademark Judges serve as the final agency decision makers in trademark registrability questions in the context of appeals taken by an applicant from the Trademark Examining Attorney's refusal of registration.  The TTAB also serves as the final agency decision maker in *inter partes* trademark registrability proceedings including oppositions to prevent registration of a trademark and cancellations to cancel existing trademark registrations.

8.      In my position as an Administrative Trademark Judge, I authored final agency decisions on registrability issues and participated on three-Judge panels with respect to final decisions authored by other Judges.

9.      In August, 1989, I left government service and joined the firm of Sughrue Mion, PLLC (formerly Sughrue, Mion, Zinn, Macpeak & Seas, PLLC) in Washington D.C.  I am currently a partner in that firm, specializing in trademark law, unfair competition and litigation before state and federal courts and the PTO.

10.     In addition to being admitted to practice before the D.C. Court of Appeals, I have been admitted before the U.S. District Court for the District of Columbia, the U.S. Court of Appeals for the District of Columbia Circuit, the U.S. Court of Appeals for the Federal Circuit and the U.S. Supreme Court.

11.     I have lectured frequently on subjects relating to trademark law, trademark protection and practice before the TTAB at meetings, seminars and conferences sponsored by the District of Columbia Bar, the International Trademark Association, the American Intellectual Property Law Association and various other state and city bar associations.  I have also lectured in China, Japan, Germany and The Netherlands on U.S. trademark law matters as an invited lecturer of associations of trademark practitioners in those countries.

12.     I have authored several articles on various aspects of trademark law and protection which have been published in IP Litigator, The Trademark Reporter, The American Intellectual Property Law Association Selected Legal Papers and the D.C. Bar Intellectual Property Law Section Newsletter.  I am the author of a book entitled Trademark Trial and Appeal Board Practice and Procedure which was first published in April, 1997 and is updated annually.  In addition, I am a former adjunct Professor at The

Catholic University School of Law in Washington, D.C., where I taught trademark law and unfair competition for a number of years.

13.     I am a former Chair of the Public Advisory Committee to the trademark operation of the U.S. Patent and Trademark Office.  I am a former co-Chair of the Steering Committee of the Intellectual Property Law Section of the D.C. Bar, a former Chair of the Trademark Committee of the Intellectual Property Law Section of the Bar Association of the District of Columbia and a former Chair of the ABA Sub-Committee on TTAB Affairs.  I am a former editor of the Trademark Reporter, a quarterly publication on matters of interest to the trademark bar.  I am currently and have in the past been listed in the "Guide to the World's Leading Trademark Law Practitioners" sponsored by Managing Intellectual Property magazine and I am currently and have in the past been listed in the "International Who's Who of Trademark Lawyers."  A current resume setting forth my education, experience and publications is attached hereto as Exhibit No. 1.  In addition, attached hereto as Exhibit 2 is a listing of cases in connection with which I have testified as an expert at trial or by deposition within the preceding four years.

14.     With respect to my compensation in connection with time expended in reviewing this matter and providing my testimony or other opinions, I am being compensated at my usual rate of $645.00 per hour.

## II.     BASES FOR TESTIMONY

15.     In preparing for my testimony, I have familiarized myself with the issues in this case pertinent to my opinions by reviewing:

(a)     Plaintiff's Complaint;

(b)     Defendants' Answer, Affirmative Defenses and Counterclaims;

(c)     Prosecution history of Plaintiff's Application Serial No. 78/472,619 (now Registration No. 3,075,812); and

(d)     Print outs of third party bottle designs provided to me by counsel for Defendants.

## III.     SUMMARY OF TESTIMONY

16.     It is my intention to testify about the nature of the examination of a trademark application by the PTO, including the examination of Application Serial No. 78/472,619, which matured into Registration No. 3,075,812.

17.     I also expect to testify on the examination of an application in terms of analyzing whether a mark is not entitled to registration because the asserted mark is functional, in whole or in part, as used in connection with the goods covered in the application.

18.     I also expect to testify on whether a registration can be subject to cancellation based on the functionality of the registered mark, as used in connection with the goods covered in the registration.

19.     I also expect to testify on how the PTO determines whether a mark sought to be registered is inherently distinctive and registrable upon adoption and use or is not inherently distinctive and registrable only upon a showing that the mark has acquired distinctiveness.

20.     I also expect to testify on whether rights in a mark can be abandoned through acquiescence by the trademark owner to third party uses of the same or similar mark by virtue of the trademark owner's failure to police its mark vis a vis third party uses of the same or similar mark.

21.     I also expect to testify on how the PTO analyzes the issue of fraud on the PTO by virtue of statements of commission or omission made to the PTO during the prosecution of an application for registration or in connection with the maintenance of a registration.

## IV.     EXPECTED TESTIMONY

### A.     Examination of Trademark Applications

22.     When an application for registration is filed in the PTO, it is examined by a Trademark Examining Attorney ("Examiner"). As part of the examination of every application filed in the PTO, the Examiner assigned to the application conducts a search of the records of the PTO in order to determine whether there are any prior registrations or pending applications for marks which so resemble the mark sought to be registered as to be likely to cause confusion, mistake or deception. The Examiner also reviews each application and determines whether there are any other substantive grounds for refusal and/or any other deficiencies in the application which need to be corrected. If the Examiner finds that there are any substantive grounds for refusal and/or any other deficiencies in the application, an Office Action issues, allowing the applicant time (six months) to respond to the issues raised in the Office Action. An Office Action also may and often does include one or more requirements the Examiner may make before the mark may be approved such as, for example, a requirement to provide information about the nature of the goods, about the significance of the mark, etc.

23.     The Examiner will also determine, in each application examined, whether the applied for mark is or is not inherently distinctive. Inherently distinctive marks would include marks which are

coined terms and have no meaning except to serve as a trademark (e.g., EXXON for petroleum related goods and services). Marks which comprise ordinary dictionary words but, as applied to the goods/services covered in the application, have no meaning but are arbitrary, are also considered inherently distinctive (e.g., APPLE for computers). Also falling under the umbrella of inherently distinctive marks are marks which, as applied to the goods/services covered in the application, suggest something about the features or characteristics of the goods/services but do not immediately or directly describe any such feature or characteristic. These are considered to be suggestive marks (e.g., GOLIATH for large diameter wood pencils).

24. Marks which are considered inherently distinctive are protectable and registrable upon adoption and use.

25. On the other side of this spectrum of distinctiveness of trademarks are marks which, because of their nature, are not inherently distinctive. Such non-inherently distinctive marks include merely descriptive marks, i.e., marks which immediately and directly describe a feature or characteristic of the goods/services (e.g., STEAK 'N BREW for restaurant services offering steak and beer as featured menu items). Similarly, marks which are primarily geographically descriptive of the goods or services of the applicant are considered non-inherently distinctive (e.g., PARIS for perfume originating in Paris, France). Similarly, a mark which is considered primarily merely a surname would be considered a non-inherently distinctive mark (e.g., KRUGMAN for any product or service).

26. Non-inherently distinctive marks are only protectable and registrable on the Principal Register if and when the trademark owner can demonstrate to the PTO that the non-inherently distinctive mark has acquired distinctiveness (secondary meaning) through use and promotion of the mark for a period of time such that the mark has become associated with a single source of the goods/services.

27. With respect to marks which comprise a configuration of the goods themselves, such marks are never inherently distinctive and, if protectable at all, are only protectable upon a showing of acquired distinctiveness.

28. With respect to marks which comprise a configuration of the container or packaging for the goods, such a configuration may be so unique and distinctive in appearance that it may be considered inherently distinctive although most such configurations are not considered inherently distinctive and would be protectable only upon a showing of acquired distinctiveness.

29. When an applicant applies to register a configuration of a product or a product container, the PTO Examiner will determine whether the configuration sought to be registered is considered

primarily functional as applied to the goods.  If a configuration is found to be primarily functional, i.e., de jure functional, registration will be refused and the configuration is not registrable regardless of any evidence of acquired distinctiveness.  If, on the other hand, the configuration is not found to be de jure functional, it will be registrable only upon a showing of acquired distinctiveness in the case of a configuration of the goods and, in most cases, involving a configuration of the container for the goods. The exception, as noted above, is where the configuration of the container for the goods is so unique and distinctive in appearance that it is considered inherently distinctive.  To the extent that evidence shows the existence of third party uses of configurations of the containers for the goods, which comprise the same or similar features as the configuration sought to be registered, this would cut against a finding that the configuration sought to be registered is inherently distinctive

30.     Section 2(f) of the Trademark Act provides that a mark may be shown to have acquired distinctiveness based on a showing of substantially exclusive and continuous use of the mark in commerce for a period of time.  Section 2(f) of the Trademark Act allows for a claim of acquired distinctiveness to be claimed as to a portion of a mark where a portion of the mark is inherently distinctive but the remaining portion is not inherently distinctive and the non-inherently distinctive component is a separable element apart from the inherently distinctive element.  If the portion of the mark to which a claim of acquired distinctiveness is made is unregistrable, even under Section 2(f) because, for example, it is functional or because the applicant has failed to establish acquired distinctiveness,  that portion of the mark may be required to be disclaimed apart from the mark as a whole. See TMEP Section 1212.02(f). If, in determining whether a configuration of a product container has acquired distinctiveness, evidence is made of record to show the existence of third party uses of the same or similar  product container configurations, such evidence cuts against a finding that the configuration sought to be registered has been in substantially exclusive use and, therefore, cuts against a finding of acquired distinctiveness or secondary meaning.

31.     If, following a response to an initial Office Action, there are one or more outstanding grounds for refusal and/or uncorrected deficiencies and/or unsatisfied requirements, the Examiner will typically issue a second, final Office Action, making the refusals and/or requirements final.  In this situation, the applicant is allowed time (six months) to respond to the Office Action by filing a request for reconsideration and/or appealing the Examiner's refusal to the TTAB.

32.     If the Examiner, after examining the application and conducting the required search of the records of the PTO for confusingly similar marks, finds no basis to refuse registration to the

applicant, the mark will be approved for publication. Similarly, if an Office Action issues and the applicant overcomes the issues raised in the Office Action, the mark will be approved for publication.

33.    When a mark is registered, the registered mark covers the specific goods and/or services set out in the registration.

34.    A mark which is approved for registration by the PTO on the Principal Register is published in a weekly *Official Gazette*. Any party that believes it would be damaged by the registration of the mark may file an opposition seeking to prevent such registration. An opposition must plead and later prove the Opposer's standing to bring the opposition and must plead and later prove one or more grounds for denial of the registration. Oppositions are decided by three Administrative Trademark Judges of the TTAB assigned to the case.

35.    Once a mark actually issues into a registration, any party that believes it would be damaged by the continued registration of the mark may file with the TTAB a petition to cancel the registration. A cancellation petition must plead and later prove the Petitioner's standing to bring the cancellation action and must plead and later prove one or more grounds for cancelling the registration. Petitions to cancel are decided by three Administrative Trademark Judges of the TTAB assigned to the case.

36.    Until the registration reaches its five year anniversary, it may be cancelled on the same grounds that could be raised in the context of an opposition proceeding. Once, however, a registration reaches its five year anniversary, it may only be cancelled on one or more of the grounds set forth in Section 14(3) of the Trademark Act. Those grounds, in connection with which a registration may be cancelled at any time, include if the registered mark becomes the generic name for the goods/services, or a portion thereof, for which it is registered, or if the mark is functional or if the mark has been abandoned, or if the registration was obtained or maintained fraudulently.

**B.    Examination of Plaintiff's Application Serial No. 78/472,619
       (now Registration No. 3,075,812)**

37.    On August 24, 2004, Plaintiff filed an application to register a mark comprising a bottle design and a label design featuring the term BULLEIT BOURBON FRONTIER WHISKEY for goods described as alcoholic beverages, namely, distilled spirits. The application was filed based on a claim of use in commerce at least as early as August 25, 1993.

38.    On April 11, 2005, the PTO issued an Office Action raising several issues, as follows:

    a.    <u>New drawing page required</u>

The Examiner required that a new drawing be submitted, stating that the ". . . drawing should present  a single three dimensional view of the goods or packaging, showing those features that the applicant claims as its mark in solid lines and the remainder of the drawing in broken or dotted lines."

The Examiner stated that ". . . the applicant must use broken or dotted lines to show the marks position on the goods or container.  The applicant's current description is not sufficient because it does not identify all features that are claimed in the mark."  The Examiner stated that, once the drawing page is amended to replace the bottle outline with dotted lines, the following description may be adopted, if accurate:  "The mark consists of a label design and protruding words and designs.  The bottle shape is depicted in dotted lines to indicate placement of the claimed features of the mark.  The bottle shape itself is not claimed as a feature of the mark.  The protruding words, BULLEIT BOURBON FRONTIER WHISKEY, the protruding line below BULLEIT BOURBON, and the four protruding dots below FRONTIER WHISKEY are all claimed as features of the mark.  The label design with ridged edges is also claimed as a feature of the mark."

    b.    <u>Disclaimer</u>

The Examiner required that the descriptive words BOURBON and WHISKEY be disclaimed.

    b.    <u>Ownership of Prior Registrations</u>

The Examiner required that applicant claim ownership of two prior registrations for similar marks.

39.    On October 7, 2005, applicant filed a response to the April 11, 2005 Office Action.  The October 7, 2005 response made reference to a July 7, 2005 email from applicant to the PTO Examiner, asking about the acceptability of a proposed new drawing, and the Examiner's July 20, 2005 responsive

email.[1]  The Examiner's July 20, 2005 email noted that the earlier April 11, 2005 Office Action set forth the requirements for a new drawing page for non-distinctive bottles incorporating labels and trademarks. The Examiner went on to state that, since the configuration of the bottle was non-distinctive, the bottle and cap design must be presented in dotted lines, with the claimed trademark BULLEIT BOURBON etc. remaining as is.

40.     Applicant's October 7, 2005 response to the Office Action, while referencing the Examiner's July 20, 2005 email, stated that the April 11, 2005 Office Action did not include a refusal based on the non-distinctiveness of the bottle design; that the July 20, 2005 email appeared to raise this as a new ground for refusal not raised in the initial Office Action and that such new refusal should be waived for failure to raise it in the initial Office Action.

41.     Applicant's October 7, 2005 response went on to note that its new drawing page, submitted along with the October 7, 2005 response, while setting forth the cap and neck of the bottle in dotted lines, did not set out the bottle design in dotted lines because, applicant asserted, the bottle design comprised an inherently distinctive component of the mark.  Applicant, with its response, submitted a substitute drawing and described the mark as follows:

> "The mark consists of three-dimensional configuration of a bottle that is used to contain the goods, as well as a label design and protruding words and designs.  The label design with ridged edges is claimed as a feature of the mark.  The protruding words, BULLEIT BOURBON FRONTIER WHISKEY, the protruding line below BULLEIT BOURBON, and the four protruding dots below FRONTIER WHISKEY are all also claimed as features of the mark."

42.     Applicant, in its October 7, 2005 response to the Office Action, also complied with the Examiner's disclaimer requirement and also claimed ownership of its two prior registrations.

43.     Following the response to the Office Action, the mark was published for opposition on January 10, 2006 and issued into Registration No. 3,075,812 on April 4, 2006.  The registration was renewed in 2015 and remains in force.

---

[1]     The July 20, 2005 email from the Examiner to the applicant was attached to applicant's October 7, 2005 response to the Office Action.  The earlier referenced July 7, 2005 email from the applicant to the Examiner was not attached to the October 7, 2005 response and I have not seen that paper. It is my understanding that Defendants' have sought to obtain this document by contacting  the law firm which handled the prosecution of Plaintiff's trademark application and, further, by requesting this document from the US PTO by way of a Freedom of Information Act request but, to date, Defendants' have not been able to obtain this document.

44.     Where an application is filed which includes several elements or components, one of which comprises a configuration or partial configuration of a product or a product container, a drawing must be submitted which clearly shows the elements which are claimed as part of the mark.  If the mark includes the design of only a portion of a product or product container, broken or dotted lines must be used in the drawing to indicate that portion of the product or product container that is not being claimed as part of the mark.  In addition, broken or dotted lines should be used in the drawing to indicate elements that are functional and are being included in the drawing merely to show the position of the claimed portion of the mark, but are not otherwise part of the mark.  In such an application, the applicant must set forth a description of the mark to clearly indicate what is not being claimed as part of the mark, making it clear what any dotted or broken lines represent and stating that the matter shown in the dotted or broken lines is not part of the mark.

45.     The procedure described above was followed in connection with the examination of Plaintiffs Application Serial No. 78/472,619 inasmuch as the PTO Examiner, in the April 11, 2005 Office Action, required Plaintiff to submit a substitute drawing, showing the features claimed as part of the mark in solid lines with the reminder of the drawing shown in broken or dotted lines.  Subsequently, the PTO Examiner, in his July 20, 2005 email to Plaintiff's attorney, clearly indicated that the portion of the mark comprising the configuration of the bottle was non-distinctive and that, therefore, the bottle and cap must be presented in dotted lines.  The July 20, 2005 email also referenced four registration numbers for registered marks which also included non-distinctive bottle designs.

46.     As noted above, Plaintiff refused to submit a drawing showing the entire bottle design in dotted lines, taking the position that the lower portion of the bottle design was an inherently distinctive component of the mark.  Plaintiff further argued that since the Examiner did not set forth a lack of distinctiveness refusal in the PTO's April 11, 2005 Office Action, any such refusal intended to be asserted in the Examiner's July 20, 2005 email should be waived for failure of this issue to be raised in the original April 11, 2005 Office Action.

47.     While it is a desirable goal of the PTO to avoid piece meal prosecution of an application and Examiners should endeavor to raise all issues in an Office Action, the failure to raise an issue in an initial Office Action does not result in a "waiver" such that the issue is somehow precluded from being raised later in the prosecution of the application.  It is not uncommon for this to occur in the prosecution of an application and I have seen this occur many times in my own experience over the years.

48.     In this case, the October 7, 2005 response to the April 11, 2005 Office Action was not followed by any subsequent Office Action by the PTO Examiner.  Rather, the next action taken by the

PTO was a Notice of Publication indicating that the Plaintiff's applied for mark was to be published for opposition.  This Notice of Publication means that the PTO Examiner relied on the arguments and representations of Plaintiff's counsel set forth in the October 7, 2005 response to the Office Action and approved the mark for publication.  The registration thereafter issued on April 4, 2006 and included the following description of the mark:

> The mark consists of three-dimensional configuration of a bottle that is used to contain the goods, as well as a label design and protruding words and designs.  The label design with ridged edges is claimed as a feature of the mark.  The protruding words BULLEIT BOURBON FRONTIER WHISKEY, the protruding line below BULLEIT BOURBON, and the protruding dots below FRONTIER WHISKEY are all also claimed as features of the mark.

The registration also includes a disclaimer of the words BOURBON and WHISKEY.

### C.   Functionality Is A Ground For Cancellation Of A Registration At Any Time

49.   As noted above, once a registration reaches its five year anniversary, the registration can only be cancelled on certain limited grounds enumerated in Section 14(3) of the Trademark Act.  One of these grounds is functionality.  A registration can be cancelled at any time if it is demonstrated that the registered mark is primarily functional as applied to the goods covered in the registration.  This is true notwithstanding the fact that the PTO Examiner may not have refused registration on functionality grounds or that the PTO Examiner may have refused registration on this ground but subsequently withdrew the refusal.  The PTO Examiner's determination of registrability in the ex parte examination of a trademark application is given no weight or deference in the context of a subsequent inter partes proceeding, whether that is in the context of a cancellation proceeding before the TTAB or whether in the context of a civil action in U.S. District Court.  In any action involving a registered mark, a U.S. District Court may order the cancellation of a registration, in whole or in part, and may otherwise rectify the register with respect to the registration of any party to the action.  15 U.S.C. 1119.  Therefore, if a court determines that a registration comprises a mark which is, in part, functional, the court, in the exercise of its power to rectify the register, may order that the functional elements in the registered mark be disclaimed.  While I offer no opinion on whether the portion of the mark in Plaintiff's Registration No. 3,075,812 comprising a configuration of the product container is functional and should be cancelled on that ground, it is a ground properly raised by Defendants in the context of this civil action.

### D.     Abandonment Is A Ground For Cancellation Of A Registration At Any Time

50.     As with the ground of functionality being a ground for cancellation that can be raised at any time, Section 14(3) of the Trademark Act provides that abandonment is also a ground for cancellation of a registration that can be brought at any time, either in the context of a cancellation proceeding before the TTAB or in the context of a civil action in U.S. District Court.

51.     While most cancellation actions based on abandonment involve a situation where the registration owner has presumably abandoned its rights in the registered mark as a result of a period of non-use with no intention to resume such use, a registration owner can also be found to have abandoned its rights in the registered mark as a result of a pattern of inaction in failing to police third party infringing uses such that such third party uses have resulted in the registered mark losing its ability to function as a trademark and serve as a single source of goods sold or services rendered under the mark. This can also occur with respect to a portion of a trademark, as opposed to the mark in its entirety.  If, for example, the owner of a mark comprising words and a configuration of a portion of a product container has allowed multiple third parties to use the same or similar product container configuration, that trademark owner may have abandoned and lost whatever rights it may have had in that portion of its trademark comprising a portion of the product container. While I offer no opinion on whether Plaintiff has abandoned its rights in the product container portion of the mark which is the subject of Registration No. 3,075,812 and that the registration should be cancelled on that ground, it is a ground properly raised by Defendants in the context of this civil action.

### E.     Fraud Is A Ground For Cancellation Of A Registration At Any Time

52.     As with functionality and abandonment, fraud on the PTO is a ground for cancellation of a registration under Section 14(3) of the Trademark Act which can be bought at any time.   The Trademark Rules of Practice impose a duty of candor on trademark applicants and registrants and requires that statements made to the PTO must be truthful to the best of the knowledge of the applicant or registrant.   This duty of candor applies to all statements and representations made to the PTO, whether they are in the nature of formal responses to Office actions, emails to the PTO Examiner, oral statements made to the PTO Examiner telephonically, etc.  A showing of fraud on the PTO requires that the applicant or registrant has made willful false statements of material facts to the PTO with the intention to deceive the PTO into granting benefits to the applicant or registrant which benefits would not have been granted but for the material misrepresentations made to the PTO.  For example, if an applicant, during the prosecution of an application, falsely states to the PTO that the mark was in use in

commerce on or in connection with the goods when the applicant knew such statements were false and were only made in an effort to obtain a registration where registration would not have been allowed but for the misrepresentation made to the PTO, this would be an example of fraud on the PTO and the registration could be cancelled at any time.   Similarly, if an applicant  seeking registration of a mark comprising a configuration of the goods or of packaging for the goods made intentionally false statements to the PTO regarding the functionality or lack of functionality of some or all portions of the mark, which statements were made in order to obtain registration of the mark, which registration would not have been granted but for these false statements, these false statements would amount to fraud on the PTO and the registration could be cancelled on this ground at any time.   While I offer no opinion on whether Plaintiff's Registration No. 3,075,812 was fraudulently obtained and/or maintained, this is a ground for cancellation of Plaintiff's registration which is properly raised by Defendant in the context of this civil action.

I declare, under the penalties of perjury, that the foregoing is true and correct, to the best of my knowledge.

Date: February **14** 2019                          Gary D. Krugman

# Exhibit 1

*Gary D. Krugman*

## *EDUCATION*

Legal:          Case Western Reserve University School of Law
                Cleveland, Ohio
                J.D. June, 1973

College:        State University of New York at Albany
                Albany, New York
                B.S. June, 1969

## *EXPERIENCE*

1989-present:  Partner (since 1993), SUGHRUE MION, PLLC, specializing in trademark prosecution, litigation and related unfair competition matters

1982-1989:     U.S. Patent and Trademark Office, Administrative Trademark Judge, Trademark Trial and Appeal Board.  Exercised original jurisdiction in adjudicating inter-partes trademark proceedings in the U.S.P.T.O., served in the capacity of administrative law judge in conducting proceedings and rendering decisions which serve as the final agency adjudication, and exercised appellate jurisdiction in adjudicating ex parte appeals from refusals of the Trademark Examiner to register trademarks.

1978-1982:     U.S. Patent and Trademark Office, Attorney Examiner, Trademark Trial and Appeal Board; responsible for decisions on all interlocutory non-final motions in inter partes proceedings before the Board and responsible for drafting decisions for Board members on potentially dispositive motions.

1974-1978:     U.S. Patent and Trademark Office, Trademark Attorney-Trademark Examining Operation, examined trademark and service mark applications.

**EXHIBIT 1**

*Gary D. Krugman*
*Page 2*

## MEMBERSHIPS AND AFFILIATIONS

> D. C. Court of Appeals
> U.S. District Court for the District of Columbia
> U.S. Court of Appeals--D.C. Circuit
> U.S. Court of Appeals--Federal Circuit
> U.S. Supreme Court
> Former Adjunct Professor - Catholic University School of Law
> Former Chairman - Public Advisory Committee - U.S. Patent and
> Trademark Office - Trademark Operations
> Former Chairman - Steering Committee - IP Law Section of the D.C. Bar
> Former Chairman - ABA Subcommittee on Practice before the TTAB
> Former Member - Editorial Board, <u>The Trademark Reporter</u>

## SEMINARS AND LECTURES

> Have given numerous lectures and participated in seminars from 1978 to
> the present on various topics relating to trademark law and practice before
> the Trademark Trial and Appeal Board.  These lectures and seminars have
> been sponsored by, among others:

> > D.C. Bar
> > AIPLA
> > International Trademark Association
> > State Bar of California
> > Toledo Patent Law Association
> > Bureau of National Affairs
> > Nassau County Bar Association
> > New York Patent Law Association
> > China Council for the Promotion of International Trade
> > Houston Intellectual Property Law Association
> > Cincinnati Bar Association

## PUBLICATIONS

### <u>Articles</u>

> 1.   "The Amended Trademark Rules of Practice and Their Effect on
>      Ex Parte Appeals" Vol. 74, The Trademark Reporter (July-Aug.
>      1984)

13094742_1.DOC

*Gary D. Krugman*
*Page 3*

2.     "Motions for Judgment After Commencement of Testimony
       Periods" Vol. 73, The Trademark Reporter (Jan.-Feb. 1980).

3.     "Testimony Depositions" Vol. 70, The Trademark Reporter
       (July-Aug. 1980)

4.     "Interlocutory Do's and Don'ts Vol. 69, The Trademark Reporter
       (May-June 1979)

5.     "How To Use Discovery in Inter Partes Cases" Vol. XI, Number
       102
       AIPLA Selected Legal Papers (June 1994)

6.     "How To Effectively Prosecute Trademark Applications at the
       U.S. Patent and Trademark Office" Vol. XII, Number 1 & 2
       AIPLA Selected Legal Papers (April 1995)

7.     "Likelihood of Dilution" (co-authored with Leigh Ann Lindquist).
       Vol. VIII, Number 6, The I.P. Litigator (June/July, 2002)

### *Books*

"Trademark Trial and Appeal Board Practice and Procedure" -
published annually by Thomson/West (1997-present)

13094742_1.DOC

# Exhibit 2

# GARY D. KRUGMAN
# EXPERT WITNESS EXPERIENCE

1.   **Pinterest, Inc. v. Pintrips, Inc.**

     Case No. cv-13 04608-RS-KAW

     U.S. District Court for the Northern District of California

Mark Involved:        PINTRIPS

2.   **Flower Bakeries Brands, LLC v. Earthgrains Baking Companies, Inc. and Bimbo Bakeries USA, Inc.**

     Civil Action No. 7:13-cv-138(HL)

     U.S. District Court for the Middle District of Georgia

Mark Involved:        NATURE'S HARVEST

3.   **Philips Bryant Park, LLC v. HZ Capital Group, LLC** *et al*

     Civil Action No. 15-cv-2972(JSR)

     U.S. District Court for the Southern District of New York

Mark Involved:        THE BRYANT PARK

4.   **UHS of Delaware Inc. v. United Health Services, Inc.** *et al*

     Case No. 1:12-cv-00485

     U.S. District Court for the Middle District of Pennsylvania

Mark Involved:        UHS

5.   **C5 Medical Werks, LLC and Coorstek Medical, LLC v. Ceramtec, GmbH**

     Civil Action No. 1:14-CV-00643 (RBJ)

     U.S. District Court for the District of Colorado

Mark Involved:        Color Pink

6.  **American Cruise Lines, Inc. v. HMS American Queen Steamboat Company, LLC,** *et al*

    Civil Action No. 13-324 (RGA)

    U.S. District Court for the District of Delaware

Mark Involved:        AMERICAN CRUISE LINES/AMERICAN QUEEN, *et al*

7.  **Scat Enterprises, Inc. v. Chrysler Group LLC**

    Case No. 2:14-CV-07995 GHK (AFMx)

    U.S. District Court for the Central District of California–Western Division

Mark Involved:        SCAT PACK

8.  **Adidas America, Inc., et. al. v. TRB Acquisitions LLC et. al.**

    Case No. 3:15-CV-02113-SI

    U.S. District Court for the District of Oregon–Portland Division

Mark Involved:        RBX

9.  **Meowingtons, LLC v. Prof. Meowingtons, Ltd., et al.**

    Case No. 17-cv-60521-MOORE/MCALILEY

    U.S. District Court for the Southern District of Florida

Mark Involved: MEOWINGTONS

10.  **Jaguar Land Rover Limited v. Bombardier Recreational Products**

    Case No. 2:26-CV-13386-GAD-SDD

    U.S. District Court for the Eastern District of Michigan

Mark Involved:  DEFENDER