**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

DIAGEO NORTH AMERICA, INC.,

      Plaintiff,

v.

W.J. DEUTSCH & SONS LTD. d/b/a
DEUTSCH FAMILY WINE & SPIRITS, and
BARDSTOWN BARREL SELECTIONS LLC,

      Defendants.

Case No. 1:17-cv-04259-LLS

**MEMORANDUM OF LAW IN SUPPORT OF DIAGEO'S MOTION TO EXCLUDE**
**THE TESTIMONY OF MATTHEW G. EZELL**

Susan J. Kohlmann
Gianni P. Servodidio
Jacob D. Alderdice
Allison N. Douglis
JENNER & BLOCK LLP
919 Third Avenue, 38th Floor
New York, NY 10022
Phone 212-891-1600
Fax   212-891-1699

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................1

    A.    Poret's Opinion Finding A Likelihood Of Confusion ........................................... 2

    B.    Ezell's Opinion Finding De Minimis Confusion ................................................... 3

    C.    The Rebuttal Reports ............................................................................................. 4

ARGUMENT .......................................................................................................................5

  I.  Ezell Surveyed An Improper Universe Of Respondents........................................................7

  II.  The Ezell Survey Failed To Replicate Market Conditions......................................................9

    A.    The Ezell Survey Did Not Replicate Consumer Exposure To The Relevant
Products............................................................................................................... 9

    B.    The Ezell Survey Displayed The Redemption Packaging In A Way That Distorted
Marketplace Reality. ........................................................................................... 13

CONCLUSION....................................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                           <u>Page(s)</u>

*Am. Footwear Corp. v. Gen. Footwear Co.*,
   609 F.2d 655 (2d Cir. 1979) .................................................................................... 9, 13

*Conopco, Inc. v. Cosmair, Inc.*,
   49 F. Supp. 2d 242 (S.D.N.Y. 1999) ........................................................................ 14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ..................................................................................................... 1

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
   2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006) ............................................................. 9

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ..................................................................................................... 5

*Lang v. Ret. Living Pub. Co.*,
   949 F.2d 576 (2d Cir. 1991) ........................................................................................ 7

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
   97 F. Supp. 3d 485 (S.D.N.Y. 2015) ....................................................................... 14

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007) .............................................................. *passim*

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
   209 F. Supp. 3d 612 (S.D.N.Y. 2016) ..................................................................... 5, 7

*Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*,
   2004 WL 326708 (S.D.N.Y. Feb. 23, 2004) .............................................................. 6

*Nail All., LLC v. Poly-Gel L.L.C.*,
   2019 WL 5295501 (W.D. Mo. June 27, 2019) ......................................................... 10

*Saxon Glass Techs., Inc. v. Apple, Inc.*,
   393 F. Supp. 3d 270 (W.D.N.Y. 2019) ...................................................................... 8

*Schering Corp. v. Pfizer Inc.*,
   189 F.3d 218 (2d Cir. 1999) ........................................................................................ 6

*THOIP v. Walt Disney Co.*,
   690 F. Supp. 2d 218 (S.D.N.Y. 2010) ............................................................... 6, 9, 13

*Troublé v. Wet Seal, Inc.*,
  179 F. Supp. 2d 291 (S.D.N.Y. 2001)..........................................................................9

*Universal City Studios, Inc. v. Nintendo Co.*,
  746 F.2d 112 (2d Cir. 1984)................................................................................7, 15

*WE Media Inc. v. Gen. Elec. Co.*,
  218 F. Supp. 2d 463 (S.D.N.Y. 2002)......................................................................13

*Weight Watchers Int'l, Inc. v. Stouffer Corp.*,
  744 F. Supp. 1259 (S.D.N.Y. 1990)...........................................................................7

*YETI Coolers, LLC v. RTIC Coolers, LLC*,
  2017 WL 429250 (W.D. Tex. Jan. 28, 2017) ..........................................................10

## OTHER AUTHORITIES

McCarthy on Trademarks & Unfair Competition (5th ed. 2020) .......................... *passim*

Federal Rule of Evidence 403................................................................................1, 5

Federal Rule of Evidence 702................................................................................1, 5

## INTRODUCTION

Plaintiff Diageo North America, Inc. ("Diageo") respectfully moves pursuant to Federal Rules of Evidence 403 and 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) to exclude Matthew Ezell from testifying as an expert witness for Defendants Deutsch Family Wine & Spirits and Bardstown Barrel Selections LLC (collectively, "Deutsch") in this case and to bar any use of, or reliance on, his written report, survey evidence, and deposition testimony at trial.

Ezell's expected testimony, which opines on the likelihood of consumer confusion between the infringing Redemption packaging and the Bulleit Trade Dress, should be excluded because it relies on a survey that (1) collected data from an improper universe of survey respondents and (2) failed to adequately replicate marketplace conditions.  As set forth herein, Ezell implemented *no* screening for the price point at which respondents would consider purchasing a bottle of bourbon, thereby rendering it impossible to ascertain if any of his survey respondents were prospective purchasers of the products at issue in this case.  Moreover, Ezell's survey showed participants photographs only of a Redemption bottle in isolation—which, among other problems, entirely failed to replicate marketplace conditions where consumers would see the Redemption product side-by-side with Bulleit and other bottles.  The combined effect of these flaws renders Ezell's testimony improper and inadmissible.

## BACKGROUND

On March 1, 2019, Deutsch and Diageo each disclosed experts—Ezell for Deutsch and Hal Poret for Diageo—to opine on the likelihood of consumer confusion between the Redemption bottle packaging and the Bulleit Trade Dress.  On April 12, 2019, Deutsch and Diageo each

disclosed rebuttal experts—Michael Rappeport for Deutsch and Poret for Diageo—to respond to the survey testimony propounded by the other side.

### A.    Poret's Opinion Finding A Likelihood Of Confusion

Diageo's expert, Hal Poret, conducted an online survey of 400 actual and prospective purchasers of bourbon whiskey, split evenly into a test group and a control group.  Declaration of Gianni P. Servodidio ("Servodidio Decl."), Ex. 1 (Expert Report of Hal Poret) ("Poret Report") at 9.  Participants were screened to include only "U.S. consumers age 21 and older who have purchased in the past 6 months or are likely to purchase in the next 6 months[] a bottle of bourbon whiskey at a price point of $10 to $39.99 for a 750ml bottle."  *Id.* at 26.  Poret's survey was conducted using a Sequential Lineup version of the "Squirt" survey format, whereby participants were sequentially exposed to an image of the front of the Bulleit Trade Dress and to images of the fronts of three other bourbon products in random order—Redemption, Woodford Reserve, and Knob Creek—to "simulate[] a consumer's experience of shopping for whiskey, which typically involves encounter and consideration of multiple brands."  *See id.* at 9–10; *see also* 6 McCarthy on Trademarks & Unfair Competition § 32:174.50 (5th ed. 2020) [hereinafter "McCarthy"] (describing "Squirt" survey format).

Participants were then asked questions about whether they believed the bottles displayed in those images were made by the same company that made the Bulleit Trade Dress (to which they had already been exposed) or, alternatively, whether the companies were affiliated.  *Id.* at 19–24. Eighty out of 200 consumers believed that the Redemption bottle was made by the same company as, or by a company that is affiliated with or sponsored or approved by, the company that makes the Bulleit brand, for a 40% gross confusion rate among consumers.  *Id.* at 25.  After controlling conservatively for the "noise level" based on his findings in the control group, Poret concluded that there was a 15% net confusion rate among consumers.  *See id.*

### B.     Ezell's Opinion Finding De Minimis Confusion

Deutsch's survey expert, Matthew Ezell, conducted an online survey of 200 participants in a test group.  *See* Servodidio Decl. Ex. 2 (Expert Report of Matthew G. Ezell) ("Ezell Report") ¶¶ 4–5.  Survey participants consisted of individuals "twenty-one (21) years of age or older who reported that they were likely, in the next 6 months, to purchase a bottle of bourbon."  *Id.* ¶ 13. There was no screening question based on the price potential respondents would pay for a bottle of bourbon.   In Ezell's survey, respondents were shown the following photographs of the Redemption packaging[1] and were asked a series of questions relating to who they believed made or put out the Redemption product or was affiliated with the company that made or put out that product.  *Id.* ¶¶ 16–18.



In survey literature and case law, this is referred to as an "Eveready" format.  *See* 6 McCarthy § 32:174.  Based on his survey, Ezell drew the opinion that there was no likelihood of confusion as to source, authorization, approval, business affiliation, or business connection as between the Redemption and Bulleit products.  Ezell Report ¶ 24.

In his deposition, Ezell testified that he had only ever used an Eveready format for consumer confusion surveys, that he has never used a Squirt format, and that he did not account

---

[1] These images are not to scale relative to the images shown to participants.

for the proximity of the parties' products at all when determining the proper format for his survey. *See* Servodidio Decl. Ex. 3 (Transcript of Deposition of Matthew Ezell) ("Ezell Tr.") 252:24–253:23. Further, although Ezell agreed that price could be appropriate to consider in determining which consumers to survey, *id.* 86:15–19, he acknowledged that his survey did not screen potential respondents at all for what price they would be willing to pay for a bottle of bourbon in the next six months, *id.* 173:5–174:9. As a result, Ezell "wouldn't know one way or the other" whether someone was only willing to purchase bourbon at a price range below or above the price range of Redemption (and Bulleit) products. *See id.* 180:4–181:14.

C.    **The Rebuttal Reports**

Poret offered a rebuttal report in response to Ezell's survey. *See* Servodidio Decl. Ex. 4 (Expert Rebuttal Report of Hal Poret) ("Poret Rebuttal Report"). In this report, he described several serious flaws with Ezell's survey that, taken together, render it an unreliable indicator of whether there is likely to be marketplace confusion between the products. As discussed in more detail below, Poret explained that Ezell failed to screen for the proper universe of survey respondents and failed in multiple ways to replicate marketplace conditions, severely undercutting the reliability and probative value of his opinion.

Inexplicably, Deutsch retained a separate survey expert, Michael Rappeport, to issue a rebuttal report in response to Poret's initial report. In his rebuttal, Rappeport explicitly *agreed* that Poret's use of a controlled Sequential Lineup version of the "Squirt" format "is an appropriate form for a survey in this case" given the proximity of the products on retail store shelves. *See* Servodidio Decl. Ex. 5 (Rebuttal Report of Dr. Michael Rappeport) ("Rappeport Rebuttal Report"), at 2. Moreover, Rappeport criticized the universe selected by Poret as being overbroad because of alleged (and inaccurate) concerns about the screening criteria which required

4

respondents to have purchased bourbon in the price range of $10 to $39.99. *Id.* at 2–3.[2]  However, Rappeport's report makes no mention of the fact that Ezell's survey had *no* screening whatsoever for survey participants based on the price they would be willing to pay for a bottle of bourbon, thus making it "impossible to tell," *see* Rappeport Rebuttal Report at 3, how many respondents were likely purchasers of the products at issue in this case.

## ARGUMENT

Pursuant to Federal Rule of Evidence 702, the "trial judge" has a "special . . . gatekeeping obligation" to ensure that "all expert testimony" is relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 635 (S.D.N.Y. 2016), *aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017).  In addition, pursuant to Federal Rule of Evidence 403, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury."  Because expert testimony "can be both powerful and quite misleading because of the difficulty of evaluating it," "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.* ("*LVM*"), 525 F. Supp. 2d 558, 566 (S.D.N.Y. 2007) (quoting *Daubert*, 509 U.S. at 595).

Courts have recognized that "[i]n cases arising under the Lanham Act, [a court's]

---

[2] Rappeport's understanding of the price of Bulleit and Redemption products is incorrect, as Bulleit and Redemption products may often appear on sale for well under $30, including $20 or lower in some cases. Servodidio Decl. Ex. 6 (evidence of Bulleit and Redemption selling for less than $30 at retail).  In any event, 84% of Poret's survey respondents were purchasers of whiskey in the range of $20 to $39.99. *See* Poret Report at 30 n.7.

gatekeeper function is of heightened importance because the pivotal legal question virtually demands expert survey research on issues such as consumer perception." *Id.* at 562 (internal quotation marks and alterations omitted). In keeping with this, "courts have been advised to carefully scrutinize survey evidence particularly where a jury rather than a bench trial is contemplated." *Id.* This requires considering whether

> (1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) the objectivity of the entire process was ensured.

*Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 225 (2d Cir. 1999). "The failure to satisfy one of these criteria may result in the exclusion of the survey." *Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, 2004 WL 326708, at *8 (S.D.N.Y. Feb. 23, 2004) (citing *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984)). In addition to exclusion on the basis of a "single error," exclusion may also be justified where "the cumulative errors are so serious that the survey is unreliable or insufficiently probative." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 219 (S.D.N.Y. 2010); *see also LVM*, 525 F. Supp. 2d at 563 n.21 (collecting cases excluding survey evidence as irrelevant or unreliable).

Ezell's testimony must be excluded because (1) he surveyed an improper universe of respondents, making no effort to limit the universe to consumers who would potentially purchase bourbon within the price range of the products at issue, and (2) the survey itself failed to replicate market conditions on a number of levels. Taken independently and in conjunction, these flaws render Ezell's testimony unreliable and devoid of probative value.

## I.    Ezell Surveyed An Improper Universe Of Respondents.

Ezell's survey must be excluded because it did not screen for one of the most critical issues: whether the survey participants were actually likely to consider buying the products at issue. Identifying the correct universe of respondents is a threshold issue for a survey's reliability. A universe may be improperly over-inclusive when it "encompass[es] such a large group of persons that it includes those whose perceptions are not relevant, thus skewing the results by introducing irrelevant data." 6 McCarthy § 32:161. Indeed, "[i]f the reactions of the universe surveyed are irrelevant to the perceptions of the correct universe, then the court has the power to declare the survey inadmissible as evidence." *Id.* § 32:162. The touchstone of confusion—and therefore of relevance—is confusion among "prospective purchasers." *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 581 (2d Cir. 1991); *see also Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1273 (S.D.N.Y. 1990) (emphasizing importance of capturing correct universe of potential consumers because "[r]espondents who are not potential consumers may well be less likely to be aware of and to make relevant distinctions when reading ads than those who are potential consumers").

Courts in this circuit routinely exclude survey evidence when it relies on a universe of respondents that does not match the universe of relevant purchasers—in this case, purchasers of Redemption products. *See, e.g.*, *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (criticizing survey as "badly flawed" where it surveyed only individuals who had already purchased or leased the product at issue, rather than individuals considering such a purchase); *LVL XIII Brands*, 209 F. Supp. 3d at 643 (excluding survey that relied on "conjectur[al]" characterization of target market). Because consumers make purchasing decisions with respect to whiskey products based in part on pricing, a properly defined universe must specifically account for respondents' willingness to pay for the relevant products. *See LVM*, 525 F. Supp. 2d at 574

7

(excluding survey in part for failure to set appropriate price threshold for potential purchasers of designer handbags); *id.* at 630–32 (Special Masters' Report); *see also Saxon Glass Techs., Inc. v. Apple, Inc.*, 393 F. Supp. 3d 270, 291 (W.D.N.Y. 2019) (finding survey of "limited evidentiary value" where survey failed to screen for consumers who were interested in purchasing a smart watch in the same price range as the relevant product).

The Ezell survey flouts these principles by failing to implement *any* requirement that respondents have purchased or planned to purchase bourbon within the price range at which Redemption products are sold. *See, e.g.*, Ezell Tr. 180:4–15. As Poret explains in his rebuttal report, Ezell's failure to implement any screening for price means that "many respondents may only purchase value/economy bourbon and therefore would not likely be prospective purchasers of the relevant products." Poret Rebuttal Report at 3. In fact, there is "no way to know how many of the respondents only purchase inexpensive/value bourbon brands and are not genuine prospective purchasers of the Redemption (or Bulleit) product." *Id.* at 13.

Strikingly, Deutsch's own rebuttal expert, Rappeport, criticizes Poret for surveying respondents who indicated a willingness to purchase bourbon between $10 and $39.99 for a 750ml bottle; he thought that Poret should only have included respondents who were willing to pay over $20 per bottle. *See* Rappeport Rebuttal Report at 2–3. But Poret's selection of the price criteria was proper: Bulleit (and Redemption) fell within his defined price range. *See* Servodidio Decl. Ex. 6 (evidence showing Bulleit and Redemption selling for less than $30). And his report makes clear that the vast majority of survey respondents—84%—were purchasers of whiskey in the range of $20 to $39.99, thereby eliminating any basis for Rappeport's critique. *See* Poret Report at 30 n.7. In contrast, there is simply no way to know whether a disproportionate number of Ezell's survey-takers were only willing to buy "budget" bourbons under $10 or bourbons above

Redemption's (and Bulleit's) price points.  *See, e.g.*, Poret Rebuttal Report at 13.  Ezell's report unreliably draws conclusions about prospective purchasers of Redemption when, in fact, there is no way to tell whether he actually surveyed a critical mass of those prospective purchasers.

## II.    The Ezell Survey Failed To Replicate Market Conditions.

Ezell's opinion must also be excluded because the survey patently failed to replicate actual market conditions.  Ultimately, "[t]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."  6 McCarthy § 32:163; *accord THOIP*, 690 F. Supp. 2d at 231.  "Although no survey can construct a perfect replica of 'real world' buying patterns, a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions."  *Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001); *see Am. Footwear Corp. v. Gen. Footwear Co.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979) (affirming rejection of survey evidence where the survey failed to incorporate "actual marketing conditions" because the stimulus did not include the brand name associated with the product at issue); *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1012939, at *25 (S.D.N.Y. Apr. 19, 2006) (holding survey had no probative value because it failed to replicate marketplace conditions in which consumers encountered the relevant products).  As explained in Poret's rebuttal report, Ezell's survey diverged from market conditions in two significant ways.

### A.    The Ezell Survey Did Not Replicate Consumer Exposure To The Relevant Products.

Ezell's use of the "Eveready" survey format—where participants were only shown images of the Redemption bottle and were asked whether it was related to any other brand on the market— failed to simulate market conditions in this context.  Instead, as Deutsch's rebuttal expert Rappeport acknowledged, the Sequential Lineup version of the "Squirt" format is appropriate

here—"where the parties' products are directly competitive or sufficiently related or overlapping such that consumers would be reasonably likely to encounter both in close proximity in the marketplace." Poret Rebuttal Report at 6; *see* Rappeport Rebuttal Report at 2. In other words "[w]hen marks *exist proximately in the market*, Eveready may not, *by itself*, be appropriate to test for likelihood of confusion as to strong marks that are generally recognized, but not readily recalled." *YETI Coolers, LLC v. RTIC Coolers, LLC*, 2017 WL 429250, at *2 (W.D. Tex. Jan. 28, 2017) (quoting Jerre B. Swann, *Eveready and Squirt—Cognitively Updated*, 106 Trademark Rep. 727, 734 (2016)); *see also Nail All., LLC v. Poly-Gel L.L.C.*, 2019 WL 5295501, at *3–4 (W.D. Mo. June 27, 2019) (concluding that which survey format was appropriate hinged on whether the products were proximate in the market).

Indeed, reliance on an Eveready format that failed to properly track market conditions was one of the cumulative flaws warranting exclusion of an expert confusion opinion in *Louis Vuitton Malletier v. Dooney & Bourke, Inc.* There, a survey testing confusion between luxury handbags presented images only of the allegedly infringing handbag, rather than a "sequential presentation" of stimuli that better aligned with the marketplace reality that "consumers have a reasonable likelihood of encountering the marks at issue one after the other in a store or mall." *See LVM*, 525 F. Supp. 2d at 633 (Special Masters' Report); *id.* at 574 (approving of same).

Here, there is overwhelming evidence that, by design, Redemption and Bulleit are presented to consumers at the same price point and in close proximity on the shelf. Deutsch's "shelf strategy" was to "create visibility" by being placed next to Bulleit. Servodidio Decl. Ex. 7 (DFWS00080752, at DFWS00080764); *see also, e.g.*, Servodidio Decl. Ex. 8 (DFWS00063277) (confirming that Redemption products were placed next to Bulleit products); Servodidio Decl. Ex. 9 (DFWS00060134) (same); Servodidio Decl. Ex. 10 (DFWS00057275) (confirming Deutsch's

intention to have distributors place Redemption next to Bulleit "in every store"). Below are examples of Deutsch's shelf placement plan and images from liquor stores confirming that Redemption is, in fact, placed side by side with Bulleit.



Servodidio Decl. Ex. 7 (DFWS00080752, at DFWS00080765).



*Id.* at DFWS00080766.

11



Poret Rebuttal Report at 8.



*Id.* at 11.

This divergence from market conditions is unsurprising, given that in his deposition, Ezell confirmed that he *only uses the Eveready format to test confusion and did not consider whether another format may be more appropriate given market conditions*. *See* Ezell Tr. 252:24–253:23. The complete lack of accounting for marketplace conditions renders the survey as a whole unreliable. *See, e.g.*, *LVM*, 525 F. Supp. 2d at 574; *see also THOIP*, 690 F. Supp. 2d at 237–41 (excluding survey for using Squirt-type format that, unlike here, failed to simulate market conditions because there was not a reasonable likelihood that consumers would have encountered the products in close proximity). What is more, this problem compounds the errors introduced by the lack of a proper survey universe discussed above. By design, the Ezell survey did not present participants with an image of Bulleit, and "assume[d] that [consumers] are aware of the [senior] mark from their prior experience." *See* 6 McCarthy § 32:174. Given this format, Ezell's overbroad universe was even more problematic as it did not exclude respondents who would never be aware of Bulleit given its premium price point. There is simply no way of knowing whether the Ezell survey accurately tested for the relevant question in this case, *i.e.*, whether the likely purchasers of Bulleit and Redemption were likely to be confused.

**B.    The Ezell Survey Displayed The Redemption Packaging In A Way That Distorted Marketplace Reality.**

Another serious flaw in Ezell's survey is that respondents were not exposed to the Redemption bottle design in a way that "approximate[d] what a potential customer would encounter" in making purchasing decisions. *WE Media Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002); *see also id.* ("Germane survey evidence should make some effort to compare the impressions the marks have on potential consumers under marketplace conditions."); *Am. Footwear*, 609 F.2d at 660 n.4 (affirming rejection of survey that presented advertising stimuli divorced from the way consumers would usually see advertising for the product).

13

Here, as exhibited *supra* page 3, Ezell's survey showed three simultaneous views of the Redemption bottle packaging—from the front, the back, and the top. This was an artificial composite of a set of views that no consumer would hold simultaneously in marketplace conditions; as Ezell later admitted, "generally the product faces are outward" on a store shelf, Ezell Tr. 125:20–24, and he was not aware of any contexts where a consumer would be presented with the front, back, and top views of a bottle of alcohol simultaneously, *see id.* 268:4–269:7. Indeed, Deutsch's own pre-litigation marketing expert, when conducting qualitative online research on the Redemption packaging, advised showing respondents images *only* of the front-facing view of the bottle because that reflected "in-store reality," whereas views of the "top-down" and "back" angles would be "forced." *See* Servodidio Decl. Ex. 11 (DFWS00035893). The use of these stimuli therefore "reduced the importance and impact of the front view of the bottle," at the expense of highlighting other views with which consumers would not come into contact when viewing the product. *See* Poret Rebuttal Report at 3–4, 17–19; *cf. Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 254 (S.D.N.Y. 1999) (criticizing survey for "fail[ing] to properly replicate marketplace conditions in which the respondents would encounter" the relevant fragrance bottles, by presenting images of the products without their respective boxes).

Relatedly, as Poret explains, Ezell's survey "left the images of the product in view during the confusion questions, which risks inducing respondents to simply search for company or brand names on the label after hearing the questions . . . rather than sharing the perceptions they would form on their own under realistic consumer conditions." *See* Poret Rebuttal Report at 4. This type of "reading test" has been recognized as failing to simulate market conditions and therefore diminishing the reliability of the survey. *See Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 508–09 (S.D.N.Y. 2015). In other words, instead of being presented with the

14

front of the Redemption bottle as they would encounter it on a shelf, and being asked questions in a way that emulated the process of consumer purchase decisions, respondents were given several images of the Redemption bottle and implicitly invited to scrutinize the fine print of the bottle for clues as to its origin. Ezell's results suggest that respondents accepted this invitation to simply read details off the Redemption label to answer the questions, since respondents variously stated that Redemption originated from "a company in Indiana," "Indiana Heartland," "[L]awrenceburg[,] Indiana," and similar. *See* Poret Rebuttal Report at 24–25.

Each of these flaws standing alone would call the significance of Ezell's survey and testimony into doubt; taken together, they reveal a "badly flawed" survey that shines no light on whether prospective purchasers are likely to be confused between Redemption and Bulleit or to mistakenly believe that Redemption is affiliated with Bulleit. *See, e.g.*, *Universal City Studios*, 746 F.2d at 118.

## CONCLUSION

Based on the foregoing, Diageo respectfully requests that the Court exclude the Ezell Report and preclude Ezell from testifying to those conclusions at trial.

Dated:   New York, New York
         December 16, 2020                     Respectfully submitted,


                                      By: /s/Gianni P. Servodidio
                                          Susan J. Kohlmann
                                          Gianni P. Servodidio
                                          Jacob D. Alderdice
                                          Allison N. Douglis
                                          JENNER & BLOCK LLP
                                          919 Third Avenue, 38th Floor
                                          New York, NY 10022
                                          Phone 212-891-1600
                                          Fax  212-891-1699
                                          gservodidio@jenner.com

*Attorneys for Plaintiff Diageo North America, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2020, true and correct copies of the foregoing Memorandum of Law in Support of Motion to Exclude the Testimony of Matthew G. Ezell, and the accompanying Declaration of Gianni P. Servodidio and exhibits attached thereto, were filed electronically.  Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system.

_____/s/ Jacob D. Alderdice_____
Jacob D. Alderdice