# Exhibit 5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DIAGEO NORTH AMERICA, INC., | Case No. 1:17-cv-04259-LLS |
| Plaintiff, Counterclaim Defendant, | |
| vs. | |
| W.J. DEUTSCH & SONS LTD. d/b/a DEUTSCH FAMILY WINE & SPIRITS, and BARDSTOWN BARREL W SELECTIONS LLC, | |
| Defendants, Counterclaim Plaintiffs. | |

**REBUTTAL REPORT OF DR. MICHAEL RAPPEPORT REGARDING SURVEY EVIDENCE OF PLAINTIFF/COUNTERCLAIM DEFENDANT**

Background

I am informed that Diageo North America Inc. ("Diageo") makes and markets various whiskey products, one of which is marketed under the brand name Bulleit Bourbon. Diageo has a registration for the Bulleit bourbon bottle design mark and trade dress, which Diageo claims arises from the combination of seven specific design features. As I understand Diageo's position, they do not claim that individually any of the seven specified design features are unique and therefore constitute a defendable trademark, but rather only that their combination creates an overall look and feel which constitutes what Diageo claims is the defendable trade dress at issue. That is, Diageo claims that when taken together the seven design features constitute an overall look and feel of the trade dress of the bottle.

I am also informed that W.J. Deutsch & Sons Ltd. ("Deutsch") makes and markets whiskey under the brand name Redemption. I understand that Diageo has brought suit against Deutsch alleging that the similarity of the Redemption whiskey trade dress to the Bulleit trade dress creates a likelihood of confusion and dilution[1] between the two products.

Counsel for Diageo retained Mr. Hal Poret to "design and conduct a survey to test the extent to which, if at all, the trade dress of the Redemption bourbon bottle creates a likelihood of confusion with respect to the Bulleit Design Mark and Trade Dress."[2]

As part of their response to the Poret report, counsel for Deutsch commissioned the firm of R L Associates, and in particular Michael Rappeport, to analyze and comment on that report. This report constitutes that commentary.

---

[1] While the suit claims dilution, as far as I can tell from his report, Mr. Poret does not deal with the dilution claim, and accordingly neither will this commentary.

[2] This quotation, as is true of all otherwise unattributed quotations, is from Mr. Poret's report, in this case from page 6, and is indicated by Poret and a page number.

Overview of Commentary

a) <u>My Primary Commentary</u> - While in this section I will make a few comments relative to the methodology and implementation of the survey, my primary commentary will be in the last section of this report where I will discuss my disagreement with Mr. Poret about the interpretation and thus the meaning of his results.

b) <u>General Survey Design</u> - The Poret survey was an online controlled test version of "the Sequential Lineup version of the 'Squirt' format, which replicates a common marketplace scenario in which consumers are exposed in sequence to both parties' products in the marketplace."[3]  While I will discuss in the interpretation section of this commentary several aspects of Poret's implementation of such a design, I concur that generally speaking a controlled Sequential lineup survey form is an appropriate form for a survey in this case.

To be specific, 200 actual and prospective purchasers of bourbon (the test group) were initially shown an image of the Bulleit bourbon bottle, and then in random order shown and asked about the images of three other bourbon products; Redemption (the Defendants' brand), and two third party products (Woodford Reserve and Knob Creek).[4]

In keeping with the controlled test design, a second sample (the control cell) consisting of 200 other actual and prospective purchasers of bourbon (the control group) were asked to answer a survey "identical to that of respondents in the Test Group with the sole exception that Redemption trade dress at issue was altered so that it did not as closely resemble the Bulleit Design Mark and Trade Dress."[5]

c) <u>The sample</u> – The universe from which the sample was drawn consisted of U.S. consumers age 21 and older who answered screening questions saying that they have purchased in the past 6 months or are likely to purchase in the next six months, a bottle of bourbon whiskey at a price point of $10 to $39.99 for a 750ml bottle.  As I understand it, although prices vary from store to

---

[3] Poret page 9.
[4] Poret page 10.
[5] Poret page 12.

store and time to time, the Bulleit and the Redemption products each commonly sell in retail stores for roughly $30 to $35. However, as shown in a table of data from the Poret survey (Poret pages 29-30) only about half of the respondents (49%) said they at least sometimes paid in that range for a bottle of bourbon.

This constitutes a potential problem with the sample; namely the inclusion of respondents who said they never buy bourbon for $30 or more, and thus contradict Mr. Poret's definition of actual and prospective purchasers.[6] In particular, I think that those who never paid as much as $20 for a bottle of bourbon might well have different responses to the survey, and should not have been included in the sample. Because many respondents said they sometimes bought bourbon in more than one of Mr. Poret's price ranges, it is impossible to tell from the Poret report how many respondents said they never pay even at least $20 for a bottle of bourbon. However, the table on pages 29-30 of Mr. Poret's report indicates that as many as almost 1/3 of the actual respondents may fall in this category. In reality, as I will discuss below, this could have led to a meaningful change in Poret's measure of the likelihood of confusion, and therefore in interpretation of the results of the Poret survey.

d) <u>The Questionnaire</u> – I will discuss in the interpretation section below the problem I have with the material actually covered in the questionnaire.

e) <u>Likelihood of Confusion Results</u> – The primary result is that net of noise, the survey shows a "final net confusion level of 15%."[7]

Interpreting the Results

a) What is Meant by the Results - "Significant" Evidence of Likelihood of Confusion
Mr. Poret says a number of times that the evidentiary meaning of the results is that the 15% measured level in the survey shows a "significant" degree of likelihood of confusion (e.g., pages 25, 38 and 40). However, he never elaborates in any way on his use of the word "significant".

---

[6] Poret page 26.
[7] Poret page 39.

In my mind, this immediately raises what I consider a key issue in the use of surveys in analyzing trademark infringement: Suppose the result was 14%, would that be a significant level of confusion? How about 12% or 10%? Or suppose the result was 16%. Is that a significant difference? And at what point (assuming a high quality survey) does the proportion of the respondents in the sample showing a "likelihood of confusion" progress beyond significant evidence to being conclusive?

b) My Usual View of Significance – In my experience, defining what constitutes <u>significant</u> evidence from a survey result is a basic problem in trademark law to which there is no simple statistical answer. To the contrary, it is a complex mixture of survey results and Lanham Act law as interpreted by appropriate courts or legal commentators. Nonetheless, in my opinion there is available information with which to decide the issue in a given case. Specifically, for a number of years I have often written about surveys I conducted, and made comments on surveys by other people, which assume that survey researchers' experience combined with judicial experience of what should be protected have set the following reasonable standards for determining if the survey evidence supports or contradicts a likelihood of confusion. In particular:

- 10% or less in a quality survey is evidence of NO likelihood of confusion;
- 11 to 19% is a grey area where the evidence needs to be interpreted in terms of the details of the survey;
- 20% or more in a quality survey is evidence of likelihood of confusion.[8]

Given the 15% result found in the Poret survey, it is clear that using the structure above as a means of defining the legal meaning of likelihood of confusion, the Poret survey results lie right in the middle of the grey area and require additional interpretation. Accepting that Mr. Poret's survey is of a generally acceptable quality (as I do), this means looking for additional guidance

---

[8] These ranges do vary for a number of reasons; notably, variations in the potential damage to consumers of making a mistake. For instance, because mistakenly taking the wrong medicine is obviously at least potentially more harmful to the buyer/consumer than buying the wrong candy bar, to be evidence of infringement a likelihood of confusion survey of a medicine trademark usually has to meet a higher standard (that is show a lower likelihood of confusion) than does a candy bar survey.

from the details of his design and implementation, and I turn now to three such places where I disagree with Mr. Poret.

c) The Issue Asked About in the Poret Questionnaire

In most trademark cases there are two possible kinds of confusion. The first type is literal confusion, where the consumer does not distinguish between the defendant's product or service and the plaintiff's product or service. In such a situation the consumer would literally buy the defendant's product or service thinking he was buying the plaintiff's actual product or service covered by the trademark. The second type is source confusion, where the consumer distinguishes between the plaintiff's and the defendant's products, but thinks they both come from the same source. Another way of saying this is that it is literal confusion when the consumer thinks the plaintiff's and defendant's products (or services) are just two examples of the same brand, while for source confusion the respondent/consumer recognizes that there are two different brands at issue but thinks they both come from (are made by) the same company (source). Clearly, of the two types, literal confusion is the stronger in the sense that it is more likely to lead a consumer to buy the wrong product or service.[9]

The question posed in the Poret survey was clearly measuring source confusion which in my opinion requires somewhat stronger evidence of likelihood of confusion. That is, source confusion requires a higher proportion of respondents showing a likelihood of confusion. In other words, if the issue is source confusion, then 15% should be seen as somewhat less strong evidence than it would be for the same midrange value of the grey area for literal confusion.

d) The Seven Factor Definition of the Control

In essence, Poret defined the overall look and feel of the difference between the trade dress at issue and the trade dress of his control in terms of four factors.[10] However, as shown by even a cursory examination of the verbatim answers to the question of why the two bourbons came from the

---

[9] Thinking two products are from the same source may not be a definitive argument for a consumer since other factors, including but not limited to cost, may be of importance, while other factors will generally not be important if a consumer is literally confused.
[10] Poret page 14.

same source, of which one of those, the shape and form of the bottles, is the dominant feature. But in my understanding a single such feature almost certainly cannot be used to protect the overall look created by multiple (in this case seven) factors.[11]

e) Buying Lower Priced Bourbon

There is also one aspect of the Poret methodology that (as discussed above) may simply have given incorrect results. To be specific, the sample may have included many people who while they do buy bourbon by the bottle, said they never buy bourbon costing $20 or more. Clearly to the degree this occurred, there is less faith in the survey results; that is once again 15% should be seen as weaker evidence than that of the midrange of the grey area as defined above.

f) Summing Up – The Evidentiary Value of the Poret Survey and My Conclusion

While deciding as to whether the survey provides "significant" evidence of a likelihood of confusion is an issue of law and obviously needs to be decided by the judge, in my opinion, the three problems with the Poret report discussed above as items c), d), and e) together "significantly" undercut the claim that the Poret survey provides reliable evidence of a 15% of likelihood of confusion. That is in my opinion for the reasons stated above, the Poret survey does NOT provide "Significant" evidence of a likelihood of confusion between the Bulleit and Redemption bottles.

Personnel and Remuneration

Michael Rappeport was responsible for all aspects of this critique. Dr. Rappeport's resume, including cases and publications, is attached as Appendix A.

RL Associates is being compensated $19,500 for this critique. Dr. Rappeport's hourly compensation rate for time spent subsequent to this critique is $850/hour.

_/s/ Michael Rappeport_      April 12, 2019
Michael Rappeport

---

[11] I think it also worth noting that I have been made aware of a March 5, 2019 letter from Mr. Servodidio (counsel for Diageo) to Judge Stanton in which Mr. Servodidio makes much of the problem of the distortion in two dimensional images of bottles, as opposed to using the three dimensional bottles themselves in the survey. This is particularly the case here since the concave shape of the rear of the actual Redemption bottle is quite different from the ordinary shape of the Bulleit bottle.

APPENDIX A

RESUME OF MICHAEL RAPPEPORT

DR. MICHAEL RAPPEPORT

Dr. Rappeport has worked in market and survey research areas for more than 40 years, the last 38 as a partner of R L Associates. As part of his function he has made more than 200 appearances as an expert witness in legal cases at trial and/or through deposition. His testimony has dealt with statistics and statistical analysis, marketing, and public opinion in cases in such disparate areas as trademark infringement, libel, damages for failure to fulfill a contract, and reapportionment. He has also testified as an expert in a number of quasi-legal proceedings before a range of public boards, agencies and regulatory bodies.

Education
B.S.  Physics, RPI, Troy, New York 1957
M.S.  Electrical Engineering, Yale University, New Haven 1958
PH.D.  Statistics, New York University, 1968

Professional positions
1975 - present:  Founding partner, R L Associates, survey research and consulting firm

>    Dr. Rappeport has had wide experience both in the direction of all kinds of surveys of human populations and as a consultant in statistical, strategy planning and survey research areas.  Two areas in which he has been particularly active are studies on public policy, and studies for use in litigation.  Along with responsibility for the management of the firm, Dr. Rappeport has direct responsibility for all statistical aspects of the firm's work.  In the main this encompasses sample design and the use of a wide variety of statistical analysis techniques.  He has designed projectable national and regional probability samples of all civilian non-institutional telephone households, and a very wide range of specialized samples of all types.

1969 - 1972; 1973 - 1975:  Vice president and chief statistician, Opinion Research Corporation, Princeton, New Jersey

1972 - 1973:  Vice president, Response Analysis Corp. Princeton, New Jersey

1959 - 1969:  Supervisor, Bell Telephone Laboratories, Holmdel, New Jersey

-2-

Teaching
At various times, Dr. Rappeport has taught or conducted guest lectures in a number of colleges and universities. He has been an adjunct instructor in both Research Methods and Political Public Opinion at Rutgers University, and taught a course in Marketing at Rider College.

Articles and Speeches
Over the course of the last 25 years, Dr. Rappeport has written approximately 40 published articles, and given more than 70 speeches. He has spoken at a number of meetings of legal organizations including:

    Witness at a mock trial at April 2010 Meeting – American Bar Association Antitrust Section
    Panel Member – Annual meeting Antitrust Section of ABA – March 2009
    Faculty member – ABA-ALI seminar on Dilution – February 2004
    Participation in a 2003 panel of the Amer. Intellectual Property Law Assoc.
    Participation in a 2001 panel of the Advanced Practitioners Prog of the Intl. Trademark Assoc.
    A 1998 speech to the Bar for the Federal Circuit
    Witness at a mock trial at the Feb. 1998 Meeting – American Bar Association Antitrust Section
    A 1996 speech to the New Jersey Intellectual Property chapter of the Inns of Court
    A 1995 panel presentation for the CLE program, American Bar Assoc. – Antitrust Section
    A 1995 speech to the CLE program, American Bar Assoc. – Intellectual Property Section
    Witness at a mock trial at the 1995 meeting of the American Intellectual Property Law Assoc.

Among the wide cross-section of other types of organizations where he has spoken at an annual or other major meeting are Planned Parenthood Federation of America, United States Trademark Association, Travel and Tourism Research Association, Newspaper Research Council, Pennsylvania Hospital Association, and New Jersey Political Science Association.

Other
Dr. Rappeport is currently listed in Who's Who in America, and several other similar publications dealing with the Legal Profession, Social Sciences and Marketing. He has served on a variety of civic and professional boards. Among those most directly related to his professional activities:
Editorial Board of the "Trademark Reporter" 1993-1996, 1997-2004
Board of Advisors - Citizens Committee on Bio-Medical Ethics 1986-1994
Board of Directors, American Association for Public Opinion Research, 1976-1980; Standards
    Chairman, 1979-1980

Cases in which Michael Rappeport has appeared either by deposition or in trial as an expert witness 2014-2019. Date shown is first appearance. Unless noted all cases listed were in United States District Courts.

2018
August Deposition – Boltex Manufacturing and Weldbend v Galperti – Southern District of Texas
May Deposition – Dentsply International v Dental Brands for Less – Southern District of New York

2017
October Deposition – CaféX Communications v Amazon Web Services – Southern District of New York
October Deposition – Toyo Tire v Atturo Tire – Northern District of Illinois
August Deposition – HealthPartners v Wal-Mart and Sam's West – District of Minnesota
July Deposition – Mars v J. M. Smucker – Eastern District of Virginia
June Deposition – Trevor Singleton v Fifth Generation – Northern District of New York
March Deposition – Capital Health et al v Horizon – Superior Court of New Jersey

2016
October Deposition – Toyo Tire v CIA Wheel Group – Central District of California
September Deposition – Dropbox v Thru – Northern District of California
July Deposition – Ass Armor v Under Armour – Southern District of Florida
June Deposition – Morton & Bassett v Organic Spices – Northern District of California
May Deposition and March 2017 Trial – Coty et al v Excell Brands – Southern District of New York

2015
October Deposition – Flowers Bakeries v Earthgrains Baking Companies – Middle District of Georgia
September Deposition and June 2017 Trial – Koninklijke Philips v Hunt Control Systems – District of NJ
July Deposition – Goya v Golla Oy – District of Puerto Rico
April Deposition and May Trial – NFP v Paycom – Northern District of Illinois

2014
November Deposition – Innovative Ventures v Green Planet – Eastern District of Michigan
August Deposition – Tory Burch v Lin & J International – Southern District of New York
May Trial – Kind v Clif Bar – Southern District of New York
March Deposition – American Pro International v American DJ Supply – Southern District of Florida
March Deposition – UltimatePointer v Nintendo – Eastern District of Texas
January Deposition – Dynamic Housewares v QVC et al – Eastern District of Pennsylvania

List of publications of Michael Rappeport 1992-2019

Design Issues for Controls – Trademark and Deceptive Advertising Surveys: Law, Science, and Design; edited by Shari Seidman Diamond and Jerre B. Swann (American Bar Association, Section of Intellectual Property Law, 2012)

A Replication Problem in Survey Design, including a Critique of the Decision in Thoip v. Disney – Trademark Reporter; November-December 2010

Response to Survey Methodology Articles – Trademark Reporter; May-June 2006

The Democratic Ethos and the Positive Sum Society – Society; July-August 2003

A Rejoinder to a Critique – The Trademark Reporter; November-December 2002

Litigation Surveys - Social Science as Evidence – The Trademark Reporter; July-August 2002

Applying Daubert – National Law Journal; January 21, 2002

When Consumer Beliefs are Based on a Court's Intuition - One More Issue Arising From Conopco (with Sandra Kornstein-Cohen) – The Trademark Reporter; March-April 1997

Is Judaism Splitting Into Two religions – Sh'ma; April 1996

The Role of the Survey "Expert" - A Response to Judge Posner – The Trademark Reporter; March-April 1995

The Future of the American Jewish Community – Sh'ma; December 1994

The Patient Self Determination Act: Implementation of the Law in Nursing Homes (co-author) – Paper presented at the 122nd Annual Meeting of the American Public Health Association; November 1994

Condition Critical (co-author) – Paper presented at the 1994 Annual Meeting of the American Society of Law, Medicine and Ethics; October 1994

Statistically Based Evidence – National Law Journal, Op-Ed Page; August 1993

Prognosis Good for Lower Medical Care Inflation – Wall Street Journal Op-Ed page; February, 1993

Predicting the Election - Why Clinton Will Win – The Sunday Record (Bergen County, New Jersey); August 1992.  In addition Dr. Rappeport was a columnist on a weekly basis for the Bergen Record throughout much of 1991.  Columns dealt with a wide range of statistical and public opinion issues from crime in New Jersey to the proper reporting of retail sales.