**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DIAGEO NORTH AMERICA, INC., | |
| Plaintiff/Counterclaim Defendant, | **ECF CASE** |
| v. | Case No. 1:17-cv-04259-LLS |
| W.J. DEUTSCH & SONS LTD. d/b/a DEUTSCH FAMILY WINE & SPIRITS, and BARDSTOWN BARREL SELECTIONS LLC, | Hon. Louis L. Stanton |
| Defendants/Counterclaim Plaintiffs. | **ORAL ARGUMENT REQUESTED** |

**DEFENDANTS/COUNTERCLAIM PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION OF PLAINTIFF/COUNTERCLAIM DEFENDANT'S MOTION TO EXCLUDE SURVEY EXPERT MATTHEW EZELL**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. FACTS ............................................................................................................... 1

    A.  Mr. Ezell Surveyed Prospective Bourbon Purchasers Using the Gold
    Standard Eveready Format........................................................................... 1

    B.  Mr. Poret Surveyed Past Purchasers Using the Leading Squirt Survey
    Format ......................................................................................................... 3

III. LEGAL STANDARD......................................................................................... 6

IV. ARGUMENT ..................................................................................................... 8

    A.  Mr. Ezell Surveyed a Proper Universe of Prospective Purchasers ......................... 8

    B.  Mr. Ezell's Survey Replicated Marketplace Conditions Based on Diageo's
    Own Claims and Research, Unlike Mr. Poret.................................................... 11

        1.  The Ezell Survey Used a Non-leading Survey Format That Was
        Entirely Appropriate Based on Diageo's Claim to Fame ....................... 11

        2.  The Ezell Survey Displayed the Redemption Package as It Would
        Be Seen in the Marketplace as Shown by the Evidence .......................... 15

V.  CONCLUSION.................................................................................................. 18

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*3M Co. v. Mohan*,
  Civil No. 09-1413 ADM/FLN, 2010 WL 5095676 (D. Minn. Nov. 24, 2010) ......................12

*Akiro LLC v. House of Cheatham, Inc.*,
  946 F. Supp. 2d 324 (S.D.N.Y. 2013)...................................................................................12

*Am. Footwear Corp. v. Gen. Footwear Co. Ltd.*,
  609 F.2d 655 (2d Cir. 1979)...............................................................................................11

*Bd. of Regents of the Univ. of Houston Sys. on Behalf of the Univ. of Houston Sys.
  & Its Member Insts. v. Houston Coll. of Law, Inc.*,
  214 F. Supp. 3d 573 (S.D. Tex. 2016) ..................................................................................12

*Citigroup Inc. v. AT&T Servs., Inc.*,
  No. 16-cv-4333 KBF, 2016 WL 4362206 (S.D.N.Y. Aug. 11, 2016)....................................13

*Conopco, Inc. v. Cosmair, Inc.*,
  49 F. Supp. 2d 242 (S.D.N.Y.1999).................................................................................10, 17

*Coty Inc. v. Excell Brands, LLC*,
  277 F. Supp. 3d 425 (S.D.N.Y. 2017)..................................................................................11

*E & J Gallo Winery v. Proximo Spirits, Inc.*,
  No. 1:10-cv-00411 LJO JLT, 2011 WL 5922090 (E.D. Cal. Nov. 28, 2011) ........................12

*Elizabeth Taylor Cosmetics Co. Inc. v. Annick Goutal, S.A.R.L.*,
  673 F. Supp. 1238 (S.D.N.Y. 1987)........................................................................................5

*Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*,
  741 F. Supp. 2d 1165 (C.D. Cal. 2010) ...............................................................................12

*Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*,
  221 F. Supp. 2d 457 (S.D.N.Y. 2002).................................................................................6, 10

*Go Smile, Inc. v. Levine*,
  No. 10CV08663, 2011 WL 1209653 (S.D.N.Y. Jan. 4, 2011)...............................................13

*Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 738-39 (S.D.N.Y. 2011), *on
  reconsideration in part*, No. 09 Civ. 4373(SAS), 2011 WL 6326032
  (S.D.N.Y. Dec. 16, 2011)......................................................................................................6, 7

*Jaret Int'l, Inc. v. Promotion in Motion, Inc.*,
  826 F. Supp. 69 (E.D.N.Y. 1993) ........................................................................................10

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
No. 04 Civ.7203(DLC), 2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006) ................................11

*Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*,
No. 06 Civ. 550(JFK), 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ........................................5

*Kelly-Brown v. Winfrey*,
95 F. Supp. 3d 350 (S.D.N.Y. 2015) ......................................................................................12

*Kelly-Brown v. Winfrey*,
No. 11-CV-07875-PAC (S.D.N.Y. May 2, 2014), ECF 148-26 ................................................12

*Kroger Co. v. Lidl US, LLC*,
Civil Action No. 3:17-cv-480-JAG, 2017 WL 3262253 (E.D. Va. July 31,
2017) ......................................................................................................................................12

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
97 F. Supp. 3d 485 (S.D.N.Y. 2015) ...............................................................................7, 17

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...........................................................................8, 10, 14

*Luv N' Care, Ltd. v. Regent Baby Prods. Corp.*,
841 F. Supp. 2d 753 (S.D.N.Y. 2012) (Stanton, J.) ................................................................13

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
209 F. Supp. 3d 612 (S.D.N.Y. 2016) ....................................................................................10

*Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*,
No. 02 Civ. 3691(DLC), No. 03 Civ. 707(DLC), 2004 WL 326708 (S.D.N.Y.
Feb. 23, 2004) ...........................................................................................................................7

*Nail All., LLC v. Poly-Gel L.L.C.*,
Case No. 17-CV-01026-FJG, 2019 WL 5295501 (W.D. Mo. June 27, 2019) ........................14

*People's United Bank v. Peoplesbank*,
No. 3:08cv01858 (PCD), 2010 WL 2521069 (D. Conn. June 17, 2010), *aff'd*,
401 F. App'x 607 (2d Cir. 2010) .........................................................................................4, 5

*Saxon Glass Techs., Inc. v. Apple, Inc.*,
393 F. Supp. 3d 270 (W.D.N.Y. 2019) ..............................................................................7, 10

*Star Indus., Inc. v. Bacardi & Co. Ltd.*,
412 F.3d 373 (2d Cir. 2005) ...................................................................................................17

*The Bd. of Regents of the Univ. of Houston Sys. v. S. Tex. Coll. of Law*,
No. 4:16-cv-01839, 2016 WL 10704246 (S.D. Tex. July 27, 2016) ........................................13

*THOIP v. Walt Disney Co.*,
    690 F. Supp. 2d 218 (S.D.N.Y. 2010)............................................................6, 7, 14

*Troublé v. Wet Seal, Inc.*,
    179 F. Supp. 2d 291 (S.D.N.Y. 2001)..................................................................11

*Universal City Studios, Inc. v. Nintendo Co.*,
    746 F.2d 112 (2d Cir.1984)..............................................................................7, 8

*Weight Watchers Int'l, Inc. v. Stouffer Corp.*,
    744 F. Supp. 1259 (S.D.N.Y. 1990)......................................................................10

*YETI Coolers, LLC v. RTIC Coolers, LLC*,
    A–15–CV–597–RP, 2017 WL 429250 (W.D. Tex. Jan. 28, 2017).........................14

**Statutes & Other Authorities**

15 U.S.C. § 1125.................................................................................................13

27 U.S.C. § 215.................................................................................................16

H. Poret, *An Empirical Assessment Of The Eveready Survey's Ability To Detect
    Significant Confusion In Cases Of Senior Marks That Are Not Top-Of-Mind*,
    The Trademark Reporter, 109 TMR 935 (2019) .......................................................14

Implementation of Alcoholic Beverage Labeling Act of 1988; Health Warning
    Statements (88f406p), T.D. ATF-294 (Mar. 1990) ...................................................16

R. Bradlee Boal, *Techniques for Ascertaining Likelihood of Confusion and the
    Meaning of Advertising Communications*, 73 TMR 405 (1983) .................................5

## I.    INTRODUCTION

Deutsch retained survey expert Matthew G. Ezell ("Mr. Ezell") to conduct a likelihood of confusion survey (the "Ezell Survey") using court-approved, scientifically acceptable standards. The survey showed only 1% confusion among those surveyed. This result is not surprising because the bottle design used by Deutsch for its Redemption whiskey is completely different in appearance from the bottle design used by Diageo for its Bulleit whiskey. *See* Grow Decl. Ex. 1.

Diageo has filed a motion seeking to prevent the Court and the jury from seeing the results of the Ezell Survey, despite the fact that that the Eveready format used for the survey has been recognized by the courts as the gold standard for measuring confusion. Moreover, those interviewed in the survey were shown the entire Redemption bottle unlike those in the Diageo survey who were improperly shown only a dissected view in the survey conducted by Diageo's expert, Hal Poret ("Mr. Poret").

Diageo cited two grounds for excluding the Ezell Survey: (1) it is based on data collected from an allegedly improper universe, and (2) it allegedly failed to replicate market conditions. Neither of these grounds are valid. This brief will show that Mr. Ezell's survey surpasses the standard for admissibility and that it should be given great weight in evaluating Diageo's unfounded infringement claims.

## II.    FACTS

### A.  Mr. Ezell Surveyed Prospective Bourbon Purchasers Using the Gold Standard Eveready Format.

Mr. Ezell conducted a survey designed to determine whether the Redemption whiskey bottle used by Deutsch so resembles Diageo's Bulleit whiskey bottle that it creates a likelihood of confusion among prospective purchasers. Mr. Ezell's survey was conducted among the proper universe of prospective purchasers of bourbon whiskey. To participate in the survey, individuals

had to affirmatively answer a standard screening question as to whether they were likely to purchase bourbon whiskey in the next six months. *See* Grow Decl. Ex. 4 (Ezell Rep.) ¶¶ 13–14. Mr. Ezell also ensured that the demographics of the survey participants matched those of bourbon drinkers based on a nationally representative sample. *See Id.* ¶ 14 n.5.

Mr. Ezell chose not to limit survey participants by price range for several reasons. First, the price of the parties' Redemption and Bulleit products at issue in the 750mL bottle designs ranges from $18 to $80.[1] Second, the price differences between the parties' products are minimal, often only $2. *See* ECF Nos. 146 and 146-33 (Servodidio Decl. ¶ 34, Ex. GG at DFWS00080762 ("Pricing relative to Bulleit (parity to -$2.00)" and "Average retail pricing $27.99 - $29.99")). Third, consumers will encounter all types of prices for bourbon whiskey when in the store, bar, and even online. *See* Grow Decl. Ex. 2 (Poret Rebuttal) at 11 (image showing products above Redemption for over $100 and $200). Fourth, distributors of bourbon whiskey regularly market their product to consumers who previously had bought only cheaper whiskey. *See* Grow Decl. Ex. 3 (Dep. of Michael Zitelli, 30(b)(6) witness of Edrington Group USA) at 80:9-23. Finally, Diageo's own expert found that the number of "value" consumers who only purchase bourbon whiskey at $10 or below is very small, as shown with Mr. Poret's own data that less than 2% of his respondents selected this price range. *See* Grow Decl. Ex. 11 (Poret Rep.) at 29–30. This 2% potentially includes respondents who also said they purchased bourbon whiskey at higher prices as well. *See id.*

---

[1] Deutsch's 750ml products in the accused Redemption trade dress sell for a range of $19.98 to *at least as high as $68.99.* Deutsch's Statement of Undisputed Facts ¶ 241, ECF No. 141 (citing Grow Decl., Ex. 157 (DFWS00158298); Grow Decl., Ex. 162 (DFWS00158131); Grow Decl., Ex. 158 (DFWS00158084)). Bulleit 750ml products are sold in the asserted packaging from prices ranging from at least $17.99 to *at least as high as $79.99. Id.* ¶ 240 (citing Grow Decl., Ex. 156 (DFWS00167835); Grow Decl., Ex. 155 (DFWS00158054)).

The Ezell Survey used the widely accepted Eveready format. *See* Grow Decl. Ex. 4 (Ezell Rep.) ¶ 15. Mr. Ezell chose this format because it "is the least leading" format and it is so widely accepted that it has been called the "gold standard" for measuring likelihood of confusion. *See* Grow Decl. Ex. 5 (Ezell Dep. Tr.) at 250:4-11. By contrast, the Squirt format used by Mr. Poret is less reliable because the questions are inherently leading and more prone to generating inaccurate results.

In designing the survey, Mr. Ezell chose to replicate market conditions by allowing survey respondents to see the entire Redemption bottle. Each respondent was shown the front, back, and top views of the bottle. *See* Grow Decl. Ex. 4 (Ezell Rep.) ¶¶ 16, 18 n.6. These three views simulated what a consumer would experience when viewing the bottle at a store, bar, and even online.[2] Me. Ezell also allowed respondents time to view the bottle at their own pace, which is consistent with actual market place condition as shown by Diageo's consumer research. *See* Deutsch's Statement of Undisputed Facts ¶¶ 254-256, 258, ECF No. 141; *see also* Grow Decl. Ex. 5 (Ezell Dep. Tr.) at 258:17-24; 295:11-23.

### B. Mr. Poret Surveyed Past Purchasers Using the Leading Squirt Survey Format.

In contrast, Mr. Poret deliberately attempted to bias his survey in favor of Diageo by violating long established standards of acceptable scientific research. Mr. Poret used an improper universe by including individuals not likely to purchase bourbon whiskey. While Mr. Ezell's

---

[2] (1) Consumers will be exposed to the back or top of the Redemption, Bulleit, or other bottle when it is displayed on barrels, boxes, lower shelves, or volumetric displays in a store. *See* Grow Decl. Ex. 6 (DFWS00140466); Grow Decl. Ex. 5 (Ezell Dep. Tr.) at 124:23-125:24, 283:24-284:19; (2) Consumers will be exposed to the back or top of the Redemption, Bulleit, and other bottles when it is displayed online. *See* Grow Decl. Ex. 7 (DFWS00167009 (Bulleit); DFWS00167022 (Bulleit)); Grow Decl. Ex. 8 (DFWS00155363, DFWS00155368 (Bello Dep. Ex. 53 (Elijah Craig Registration with back of bottle online))); (3) Consumers will be exposed to the concave back of the Current Redemption bottle when they pick it up. *See* Grow Decl. Ex. 9 (Bello, Diageo 30(b)(6) Dep. Tr.) at 37:3-10; (4) Consumers will be exposed to the top of the Redemption, Bulleit, and other bottles when they visit shelves at the stores, carry the bottle, or see others carry the bottle. *See* Grow Decl. Exs. 6 (DFWS00140466), 10 (DFWS00140402).

3

survey limited survey respondents only to those who were likely to purchase bourbon whiskey in the coming six months, Mr. Poret included respondents who had <u>previously</u> purchased bourbon but clearly stated that they were <u>not</u> likely to buy it in the future. *See* Grow Decl. Ex. 11 (Poret Rep.) at 29 (including "respondents who previously answered that they have purchased a bottle of 'bourbon whiskey' in the past six months, <u>**or**</u> that they are likely to do so in the next six months") (emphasis added).[3]

Unlike Mr. Ezell, Mr. Poret also failed to validate his sample by failing to consider the demographics of whiskey purchasers. Instead, Mr. Poret arbitrarily and unscientifically selected a sample based on his "understanding" of the demographics and not on any empirical data. *See* Grow Decl. Ex. 11 (Poret Rep.) at 32; Grow Decl. Ex. 12 (Poret Dep. Tr.) at 77:7-25. Mr. Poret then arbitrarily excluded purchasers of products above $40, despite evidence in his own reports and in Diageo's own Daubert brief that Bulleit is sold above that price range, even in the 750mL container.[4] *See supra* n.1. Mr. Poret likely excluded these purchasers to exclude those who might exercise greater care and thus were less likely to be confused in buying more expensive products.

Mr. Poret used a sequential Squirt survey format, for which he has been criticized in the past due to its inherent demand effect bias. *See* Grow Decl. Ex. 11 (Poret Rep.) at 9–10; *see, e.g.*, *People's United Bank v. Peoplesbank*, No. 3:08cv01858 (PCD), 2010 WL 2521069, at *7 (D.

---

[3] Mr. Poret's data shows that he included up to 38 respondents who responded that they were not likely to purchase bourbon whiskey in the coming months. *See* Grow Decl. Ex. 15 (Poret Rep. App'x D) (respondents with a "1" for column Q130r2, a "0" for either column Q135r5 or Q140r2, and a "1" for any of the columns of Q145r1 - Q145r6, which includes the following record Nos. 18; 73; 120; 137; 172; 190; 227; 242; 253; 308; 330; 338; 357; 374; 399; 403; 428; 587; 589; 590; 639; 643; 646; 651; 795; 896; 920; 970; 1068; 1095; 1118; 1172; 1374; 1398; 1450; 1545; 1585; 1608).

[4] *See* Grow Decl. Ex. 11 (Poret Rep.) at 26, 29-30; Grow Decl. Ex. 2 (Poret Rebuttal) at 7-8, 11 (identifying Bulleit sold for $41.99-42.99, Redemption sold for $47, and Woodford Reserve sold for $45.99 with a sale price of $41.39); *see also* Grow Decl. Ex. 12 (Poret Dep. Tr.) at 191:6-9, 195:3-198:10, 333:4-17 (admitting he was aware of Bulleit and Redemption products that sell for over $40 and that due to his pricing screening questions, "some prospective purchasers . . . could have been excluded" from the survey); Diageo's Ezell Br. at 12, ECF No. 234 (displaying pictures from the Poret Rebuttal discussed above but removing any discussion on price).

Conn. June 17, 2010) (denying preliminary injunction in case involving the trademarks PEOPLESBANK and PEOPLE'S UNITED BANK for banking services and ignoring the results of Mr. Poret's suggestive sequential Squirt survey because "[t]he question posed-which if any of the banks are the same as or affiliated with Defendant-provokes a 'demand effect'")[5], *aff'd*, 401 F. App'x 607 (2d Cir. 2010).

To further inflate the appearance of confusion, Mr. Poret violated one of the most important requirements for a valid survey by showing respondents only a dissected view of the Redemption and Bullet bottles, thereby concealing some of their most notable differences and thus failing to replicate market conditions. *See* Grow Decl. Ex. 11 (Poret Rep. at 15–19). Interestingly, Mr. Poret chose to show multiple angles of a product in other cases. *See* Grow Decl. Ex. 12 (Poret Dep. Tr.) at 96:17-99:18. And, Diageo knew better than to allow Mr. Poret to take this approach because it falsely alleged in its motion to dismiss Deutsch's counterclaims that Deutsch had improperly dissected the Bulleit bottle design. *See* Mem. of Law in Supp. of Mot. to Dismiss Defs.' Countercl. 7–8, ECF No. 28. Yet, Diageo's '812 registration for the Bulleit bottle design and its list of elements in its Complaint both claim right to a three-dimensional bottle, not merely the front of one.[6]

---

[5] *See, e.g.*, *Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*, No. 06 Civ. 550(JFK), 2007 WL 2258688, at *4-8 (S.D.N.Y. Aug. 6, 2007) (excluding the sequential *Squirt* style design for being leading and creating "demand effects" and stating that an *Eveready* survey "is much more reliable because it more accurately approximates actual market conditions by ensuring that respondents are not made artificially aware of the other party's trademark.") (internal quotations and citation omitted); *Elizabeth Taylor Cosmetics Co. Inc. v. Annick Goutal, S.A.R.L.*, 673 F. Supp. 1238, 1248 (S.D.N.Y. 1987) (finding *Squirt*-style survey "immaterial and entitled to no weight" in case involving marks used on similar perfume products because "[t]he proper test for likelihood of confusion is not whether consumers would be confused in a side-by-side comparison of the products, but whether confusion is likely when a consumer, familiar to some extent with the one party's mark, is presented with the other party's goods alone"); R. Bradlee Boal, *Techniques for Ascertaining Likelihood of Confusion and the Meaning of Advertising Communications*, 73 TMR 405, 422 (1983) (Squirt surveys "strongly suggests a possibility that might not have occurred to the interviewees—that the products are made by the same company. At the very least, it suggests that the conclusion is a reasonable one he should consider, even if he has not done so previously.").
[6] *See* Complaint ¶ 13, ECF No. 1 (identifying the "Bulleit Design Mark and Trade Dress" as "a distinctive combination of features including: a. Clear **canteen-shaped glass bottle** with rounded shoulders . . . .") (emphasis added); *id.* ¶¶ 17-18; Complaint Ex. B, ECF No. 1-2 (U.S. Trademark Registration No. 3,075,812 covers a side

### III.    LEGAL STANDARD

Diageo distorts the standard for considering survey admissibility. This Court considers several factors when determining whether to exclude a survey, including whether:

> (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts.

*THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230-31 (S.D.N.Y. 2010) (footnote and citation omitted).

Furthermore, this Court has emphasized that " errors in survey methodology usually go to weight of the evidence . . . ." *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 738-39 (S.D.N.Y. 2011), *on reconsideration in part*, No. 09 Civ. 4373(SAS), 2011 WL 6326032 (S.D.N.Y. Dec. 16, 2011). In fact, "courts have focused on whether the survey is <u>so far out of the realm of relevance</u> that a jury should not even be permitted to consider it." *Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*, 221 F. Supp. 2d 457, 460–61 (S.D.N.Y. 2002) (emphasis added). Instead, "many surveys that might be accorded little weight after an analysis of their methodology would still pass muster under Rule 403." *Id.* Here, the Ezell Survey is not so far out of the realm of relevance; instead, it is highly relevant.

Diageo's own arguments refute its attempt to exclude the Ezell Survey by conceding that any alleged flaws go to the weight to be given to the survey, not its admissibility. *See* Diageo Ezell Br. 15, ECF No. 234 ("Each of these flaws standing alone would call the significance of Mr. Ezell's survey and testimony *into doubt* . . . .") (emphasis added*); Id.* at 8–9, 14 (citing 6 J.

---

angle view of the Bulleit bottle and claims rights in a mark that "consists of a **three-dimensional configuration of a bottle** that is used to contain the goods . . . .") (emphasis added).

Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:163 (5th ed. 2020) ("'[t]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the ***greater the evidentiary weight*** of the survey results.'") (emphasis added); *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 508–09 (S.D.N.Y. 2015) ("the identified deficiencies in the mechanics of surveys have been criticized by the courts, leading them to give a survey *little weight* as evidence, *not that courts have excluded surveys on that basis*.") (citations and internal quotation marks omitted) (emphasis added); *Saxon Glass Techs., Inc. v. Apple, Inc.*, 393 F. Supp. 3d 270, 291 (W.D.N.Y. 2019) ("the general rule is that *cross-examination, and not exclusion* by the Court, is the appropriate way to raise criticisms of the survey's methods.") (emphasis added) (citations and internal quotation marks omitted)).

Diageo's cited cases excluding surveys involve flaws that are not present in the Ezell Survey but which do justify exclusion of the Poret survey, such as his inclusion of past purchasers and failing to replicate market conditions by showing only a dissected view of the trade dress at issue here. *See Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, No. 02 Civ. 3691(DLC), No. 03 Civ. 707(DLC), 2004 WL 326708, at *8-9 (S.D.N.Y. Feb. 23, 2004) (excluding survey with multiple major errors, including having only 52 total respondents); *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir.1984) (excluding survey with several significant errors, including ***surveying past purchasers*** instead of prospective ones) (emphasis added); *THOIP*, 690 F. Supp. 2d at 231-241 (excluding Squirt survey because of multiple errors, including failing to use an adequate control and ***failing to reflect actual marketplace conditions*** by pairing together competing products that were never sold together) (emphasis added); *see also Gucci Am., Inc.*, 831 F. Supp. 2d at 743–44 (discussing how his prior decision in *THOIP* was based on these significant errors), *on reconsideration in part*, No. 09

CIV. 4373 (SAS), 2011 WL 6326032 (S.D.N.Y. Dec. 16, 2011)); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 563 n.21 (S.D.N.Y. 2007) (excluding survey with multiple flaws including poor screening questions, an improper sampling method, a biased survey location, and few total respondents).

## IV.    ARGUMENT

### A.  **Mr. Ezell Surveyed a Proper Universe of Prospective Purchasers.**

Contrary to Diageo's claim and in contrast to Poret's survey, Mr. Ezell included only respondents who were likely to buy the products at issue in the coming months. Mr. Poret included some prospective purchasers but also included those who said they were _not_ going to buy in the future.

Diageo's own cited authority shows that Mr. Poret, not Mr. Ezell, surveyed an improper universe. *See, e.g., Universal City Studios, Inc.*, 746 F.2d at 118 (criticizing survey as "badly flawed" when it included only individuals who had _already purchased_ or leased the product at issue, rather than individuals considering such a purchase) (emphasis added).

Mr. Ezell's survey, unlike Mr. Poret's, was based on the actual demographics of bourbon whiskey drinkers. Thus, his data was not skewed in any way by an over or underrepresentation of a particular demographic.

Also, Mr. Ezell's survey was not limited to a specific range of prices, as Mr. Poret's arbitrarily was. As explained above, *see supra* § II.A., (1) the prices for these products cover a large range of $18–$80; (2) the price difference between the two products is minimal; (3) consumers will encounter all types of prices for bourbon whiskey in the store, bar, and even online, as they are often near each other; (4) distributors of bourbon whiskey regularly try to up-sell their whiskey to consumers, including these "value" consumers; and (5) the number of

"value" consumers who purchase bourbon whiskey only at $10 or below is very small, as shown with Mr. Poret's data that less than 2% of his respondents selected this price range by itself or with other price ranges. Diageo and Mr. Poret have provided no data to show why respondents from Mr. Ezell's survey would be drastically different in what they are willing to pay for bourbon whiskey on either end of the cost spectrum.

In response, Diageo attempts to mischaracterize Deutsch's rebuttal expert Michael Rappeport ("Dr. Rappeport"), but it misses the point of his comments.[7] Dr. Rappeport pointed out that Mr. Poret arbitrarily limited his survey respondents in the $10 to $40 range despite evidence that the products "commonly sell in retail stores for roughly $30 to $35." *See* Grow Decl. Ex. 13 (Rappeport Rebuttal Rep.) at 2–3. Mr. Poret chose to include this arbitrary price range of $10 to $40 despite knowing that Bulleit sells for the much wider $18 to $80 range. Mr. Poret could have either included the entire range or focused on the most common purchase price. Instead, he chose a random range that included some but excluded other purchasers of these products. Dr. Rappeport did not say that a price range had to be used nor did he say there was anything improper about Mr. Ezell's conclusion that a price range limitation was unnecessary.

Diageo and Mr. Poret then speculate that respondents in Mr. Ezell's survey "may" have purchased only "cheap" bourbon and so would not be a prospective purchaser of the products in this case. Yet, they offer no evidence in support of this allegation. Even if this speculative argument was accurate, purchasers of whiskey under $10 are likely less sophisticated and therefore more likely to be confused. Thus, taken to its logical conclusion, the survey would have

---

[7] Diageo has moved to exclude Dr. Rappeport as an expert claiming that his opinions cannot be relied on. *See* Diageo Mot. to Exclude Rappeport, ECF No. 237. Yet, Diageo attempts to twist his opinions to support its arguments. Thus, Diageo seeks to hold Deutsch to a standard to which it has not complied.

skewed <u>more</u> in Diageo's favor and elevated confusion. The Court should disregard this meritless argument.

Regardless, courts have found that an under-inclusive universe is less reliable than an over-inclusive one. *See Friesland Brands, B.V.*, 221 F. Supp. 2d at 460–61 (holding that a survey with an "'overbroad'" universe still had probative value); *see also Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253 (S.D.N.Y.1999) (discounting a survey for having a flawed and <u>under-inclusive</u> universe that improperly "excluded all men and women over the age of forty-five" even though they "represent a substantial portion of the total universe of the products' potential consumers") (emphasis added); *Jaret Int'l, Inc. v. Promotion in Motion, Inc.*, 826 F. Supp. 69, 73 (E.D.N.Y. 1993) (finding a survey was fatally flawed due to <u>under</u>-inclusive universe because the survey was "conducted in a mall where only SOUR PATCH KIDS is sold, thereby minimizing the probability that a fair sampling of SOUR JACKS purchasers was included") (emphasis added); *see also* Deutsch's Poret Br. 33-35, n. 40, ECF No. 207.

The cases relied upon by Diageo are inapplicable here in that they involve luxury goods or other drastically different facts. *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 643 (S.D.N.Y. 2016) (excluding survey that relied on "conjectur[al]" characterization of target market); *Louis Vuitton Malletier*, 525 F. Supp. 2d at 574, 602–605 (excluding survey in part for failure to set appropriate price threshold for potential purchasers of designer handbags that cost $350 or more); *Saxon Glass Techs., Inc.*, 393 F. Supp. 3d at 282, 291 (denying motion to exclude survey for failing to have price screening question for product costing $249 or more because "the general rule is that cross-examination, and not exclusion by the Court, is the appropriate way to raise criticisms of the survey's methods") (citations and internal quotation marks omitted); *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp.

1259, 1273 (S.D.N.Y. 1990) (excluding survey in part for "including participants who did not qualify").

B. **Mr. Ezell's Survey Replicated Marketplace Conditions Based on Diageo's Own Claims and Research, Unlike Poret.**

Mr. Ezell's survey matched marketplace conditions by using a survey format regularly accepted by this Court under the same circumstances and by displaying the product in the same manner as consumers would experience it in the marketplace. Diageo's cited cases on the standard for marketplace conditions offer no help to the Court as each of those surveys failed to even display the products. *See Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001) (excluding survey format because of "the lack of a proper universe and sample, the poor choice of location, the lack of proper stimuli, and questions that have little or no relevance to issues in the case"); *Am. Footwear Corp. v. Gen. Footwear Co. Ltd.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979) (excluding survey involving the same mark because it did not include the brand name on the stimulus and included non-prospective purchasers); *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ.7203(DLC), 2006 WL 1012939, at *25 (S.D.N.Y. Apr. 19, 2006) (excluding survey that did not "replicate the marketplace conditions" because it "did not show the product to the respondents").

1. **The Ezell Survey Used a Non-leading Survey Format That Was Entirely Appropriate Based on Diageo's Claim to Fame**

As courts in this and other circuits have repeatedly held, Eveready is the gold standard for reliability and the best survey to use when the mark or trade dress is well-known. *See, e.g., Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 451 (S.D.N.Y. 2017) (finding the unaided Eveready survey design to test possible confusion between Calvin Klein's and defendant's perfume products was "**more reliable**" than alternative survey design and acknowledging that Eveready surveys are considered the "**gold standard**") (emphasis added) (citation omitted);

11

*Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 339 (S.D.N.Y. 2013) (finding in case involving competing hair products that a juror could conclude that a party's Eveready survey "follows a **standard, generally accepted survey format** and presents a definitive finding that a negligible number of consumers were confused.") (emphasis added).[8]

Due to its reliability, courts routinely admit and rely on *Eveready* surveys, including those done by Mr. Poret in cases involving products that directly compete in the marketplace. *See, e.g.*, *Kelly-Brown v. Winfrey*, 95 F. Supp. 3d 350, 362 (S.D.N.Y. 2015) (accepting Mr. Poret's *Eveready* survey for defendant), *see* Ex. V to Sitwala Decl. in Supp. of Mot. for Summ. J., *Kelly-Brown v. Winfrey*, No. 11-CV-07875-PAC (S.D.N.Y. May 2, 2014), ECF 148-26; *3M Co. v. Mohan*, Civil No. 09-1413 ADM/FLN, 2010 WL 5095676, at **14, 21 (D. Minn. Nov. 24, 2010) (accepting Mr. Poret's *Eveready* survey for plaintiff in case involving competing stethoscope trade dress designs); *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1179 (C.D. Cal. 2010) (relying on Mr. Poret's *Eveready* survey for plaintiff in case involving competing water bottle brands); *Bd. of Regents of the Univ. of Houston Sys. on Behalf of the Univ. of Houston Sys. & Its Member Insts. v. Houston Coll. of Law, Inc.*, 214 F. Supp. 3d 573, 593 (S.D. Tex. 2016) (finding Mr. Poret's survey for plaintiff "using the well-accepted Eveready methodology" in case involving competing local law schools was "substantially stronger" than defendant's survey); *see also* Deutsch's Poret Br. 18-23, ECF No. 207 (and cited cases).

Mr. Poret himself has argued for the Eveready survey format:

---

[8] *Accord Kroger Co. v. Lidl US, LLC*, Civil Action No. 3:17-cv-480-JAG, 2017 WL 3262253, at *5 n.5 (E.D. Va. July 31, 2017) ("Thomas McCarthy, who wrote the 'bible' on trademarks, calls the Eveready survey the 'gold standard.'"); *E & J Gallo Winery v. Proximo Spirits, Inc.*, No. 1:10-cv-00411 LJO JLT, 2011 WL 5922090, at *3 (E.D. Cal. Nov. 28, 2011) (stating in case involving competing spirits products that "the parties agree that the Eveready method or the 'standard survey format' is the 'gold standard' for determining whether there is a likelihood of confusion.").

> [It] is non-suggestive and does nothing to call the senior user to mind. The
> respondent can only express confusion if the senior user . . . comes to mind without
> the survey ever mentioning it in the instructions, questions, or stimuli. This is a fair
> and conservative way to test for likelihood of confusion.

*The Bd. of Regents of the Univ. of Houston Sys. v. S. Tex. Coll. of Law*, No. 4:16-cv-01839, 2016

WL 10704246 (S.D. Tex. July 27, 2016) (Mr. Poret's statements on his Eveready survey design

in a case involving trademark infringement claims in connection with competing local law

schools); *see also Go Smile, Inc. v. Levine*, No. 10CV08663, 2011 WL 1209653, n.3 (S.D.N.Y.

Jan. 4, 2011) (Expert Report Of Hal Poret) ("An Eveready format is suitable because the

[defendant's] products *can be* encountered outside of the presence of [plaintiff's product] and

because [plaintiff] *alleges that it is a well-known mark* in the context of teeth whitening

products.") (emphasis added). Thus, Mr. Poret has no credibility when he claims that an

Eveready survey is not a reliable format to use when the products are competing in close

proximity.

      Diageo ignores the fact that Eveready surveys are the best format for cases involving an

allegedly well-known mark like the Bulleit mark and trade dress.[9] Diageo has asserted a claim of

dilution in this case which only applies to marks that are so famous as to have become household

names. *See* 15 U.S.C. § 1125(c)(2)(A) ("widely recognized by the general consuming public of

the United States"); *Luv N' Care, Ltd. v. Regent Baby Prods. Corp.*, 841 F. Supp. 2d 753, 757–58

(S.D.N.Y. 2012) (Stanton, J.) ("[N]iche fame, *i.e.* fame limited to a particular channel of trade,

segment of industry or service, or geographic region" is inadequate.). Its infringement claims are

also based on its assertion that the Bulleit bottle design is famous. Moreover, Diageo's own

expert has argued that Eveready is a proper survey format to use even when the mark does not

---

[9] *See Citigroup Inc. v. AT&T Servs., Inc.*, No. 16-cv-4333 KBF, 2016 WL 4362206, at *11 n.9 (S.D.N.Y. Aug. 11, 2016) (noting "the tension between [plaintiff's] critique of the Eveready survey design" as underestimating confusion for a mark with "low 'top-of-mind' awareness" and its claim that its mark has "acquired distinctiveness").

enjoy "top-of-mind" awareness, much less fame. *See* H. Poret, *An Empirical Assessment Of The Eveready Survey's Ability To Detect Significant Confusion In Cases Of Senior Marks That Are Not Top-Of-Mind*, The Trademark Reporter, 109 TMR 935, 941 (2019).

Diageo's only basis for challenging the Eveready format, despite alleged fame, is that the products are allegedly sold side-by-side. Yet, it fails to cite to a single case in support of this farfetched theory that an Eveready survey should be excluded simply because a "well-known" product was occasionally sold near the defendant's product.

Instead, it cites cases excluding the Squirt survey format that its own expert used. *See THOIP*, 690 F. Supp. 2d at 231 (excluding Squirt survey and allowing Eveready survey). It also cites to cases when the products were sold in different stores in the same mall and when the survey had multiple, major deficiencies. *See Louis Vuitton Malletier*, 525 Supp. 2d at 633. It then cites again to cases outside this circuit, which are not even binding in their own circuits, and which <u>accepted</u> surveys using the Eveready format. *YETI Coolers, LLC v. RTIC Coolers, LLC*, A–15–CV–597–RP, 2017 WL 429250, at *2 (W.D. Tex. Jan. 28, 2017) (denying motion to exclude survey that combined <u>both</u> an Eveready and Squirt format, finding that any technical issues went to its weight not its admissibility); *Nail All., LLC v. Poly-Gel L.L.C.*, Case No. 17-CV-01026-FJG, 2019 WL 5295501, at *3–4 (W.D. Mo. June 27, 2019) (denying motion to exclude "*widely accepted* [Eveready] survey format") (emphasis added).

In addition to this, Diageo also distorts the Rappeport rebuttal to support its claim that Squirt is a better format than Eveready. But, Rappeport's rebuttal merely states that the Squirt survey format is "an" appropriate format if done correctly. *See* Grow Decl. Ex. 13 (Rappeport Rebuttal Rep.) at 2. He did not claim it was the *only* format or that it was *preferable* to Eveready

14

in this case. Dr. Rappeport then pointed out that Mr. Poret had not conducted his survey correctly. Thus, the Court should ignore Diageo's attempt to conflate the two.

Likewise, Diageo also mischaracterizes Mr. Ezell's comments on why he chooses to use only the Eveready format. As shown in the facts, Mr. Ezell does not conduct Squirt surveys because they are inherently misleading. *See supra* § II.A. Mr. Ezell said that he would recommend a Squirt format in certain case but would "recommend another expert" to do that survey work. *See* Grow Decl. Ex. 5 (Ezell Dep. Tr.) at 251:12-25.

Finally, Diageo claims twice in its brief that Redemption and Bulleit are seen "side-by-side." *See* Diageo Ezell Br. at 1, 11, ECF No. 234. But, there is no evidence as to how often this occurs. Since Bulleit has a much larger sales volume, such occurrences are necessarily rare. Even if this speculative argument was accurate, the Squirt methodology makes the far-fetched assumption that consumers always examine Bulleit first before subsequently examining Redemption. Eveready, in contrast, only makes the assumption that consumers will examine the accused product, and if that assumption is false, then there can be no likelihood of confusion. Diageo ultimately has not cited a single case that excluded a survey simply because it used the Eveready format when the well-known product was placed side-by-side with the allegedly infringing product.

### 2.  The Ezell Survey Displayed the Redemption Package as It Would Be Seen in the Marketplace as Shown by the Evidence.

The Ezell Survey showed the Redemption bottle design as consumers see it in the marketplace as confirmed by the evidence in this case, Diageo's claims, Diageo's expert, and federal regulations. Consumers of bourbon whisky are exposed to the back and top of the bottle, not just the front. *See supra* § II.A. n.2. When in a store, holding it on the way to the register, viewing it online or at a bar, consumers will be exposed to the bottle from all angles. *See id.* Mr.

Ezell's pictures help the respondent experience all sides of the bottle since Diageo alleges that Deutsch infringed its bottle "shape," not merely its bottle's front. One of Deutsch's experts that Diageo did not seek to exclude, Thomas Sooy, noted that photos failed to capture as much as the actual bottles. *See* Grow Decl. Ex. 14 (Sooy Dep. Tr.) at 171:6-13 ("I want to see the actual bottle . . . . [Y]ou can't tell a lot about it from the photo, in my opinion.").

The choice to show the back of the bottle also aligns with findings in federal regulations that consumers read the back label of these products. Federal law requires that a Surgeon General's health warning be disclosed in a "conspicuous and prominent place on the container of [] [alcoholic] beverage" products. 27 U.S.C. §§ 215(a), (b). After reviewing extensive industry and public comments, the Department of Treasury implemented regulations on that statute, confirming that the placement of said Surgeon General's health warning on the back label of bottles meets the federally required standard of a "conspicuous and prominent place[ment]." Implementation of Alcoholic Beverage Labeling Act of 1988; Health Warning Statements (88f406p), T.D. ATF-294 (Mar. 1990). In doing so, the Department of Treasury specifically concluded that "it is not necessary that the health warning statement be confined to the front label of a container" because "*consumers are accustomed to reading front, back, and side labels,* not only on food and drugs but *on alcoholic beverages* as well." *Id.* (emphasis added). This determination was based on review of significant public and industry comments, as well as marketplace review "of other products (e.g., foods, over-the-counter drugs, cigarettes, etc.) bearing some sort of warning statement on the label" where "although the warning statement was not positioned on a front label, it did appear to be prominent and readily legible." *Id.*

Diageo's cited case in support provides no help to its arguments. It was not on a motion to exclude and dealt with a survey that used images of the products without their respective box

16

packaging (i.e., the three-dimensional shape) and that showed a version of the product that consumers never saw. *See Conopco, Inc.*, 49 F. Supp. 2d at 254.

Diageo also claims that Mr. Ezell merely presented respondents with a reading test, but this approach is how consumers interact with the bottle in the marketplace. Diageo's own research and Second Circuit precedent both show that spirits consumers are sophisticated and take their time.[10] If the stimuli is not left in view, then the survey turns into a memory test or guessing game by respondents. And, Diageo cites no cases excluding a survey for merely allowing respondents a chance to review the stimulus closely while answering the question. It instead cites a case that noted McCarthy's support for allowing the stimulus to stay in view for point-of-sale confusion cases. *See Louis Vuitton Malletier S.A.*, 97 F. Supp. 3d at 508–09 (holding that issues with a survey would go to its weight, not its exclusion).

Diageo also tries to prove its point by pointing to respondent's open-ended answers. But, Mr. Poret previously claimed that respondent's open-ended answers do not affect the survey results when an experimental set up is used, as Mr. Ezell did. *See* Grow Decl. Ex. 12 (Poret Dep. Tr.) at 128:12–129:2 (agreeing that he would include respondents who said they were confused for reasons <u>unrelated</u> to the trade dress). Regardless, the evidence above shows that consumers do read the labels of bottles, which was simply confirmed by these verbatim answers.

---

[10] As the Second Circuit has recognized, in the market for alcohol beverages: "consumers may be expected to educate themselves sufficiently to recognize the respective brands names." *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 390 (2d Cir. 2005); *Id.* ("Unhurried consumers in the relaxed environment of the liquor store, making decisions about $12 to $24 purchases, may be expected to exhibit sufficient sophistication to distinguish between Star's and Bacardi's [competitive spirits] products, which are differently labeled."). Diageo documents similarly reveal its research findings that whiskey consumers are increasingly sophisticated and discerning and take time and care in making spirits purchase decisions. *See* Deutsch's Statement of Undisputed Facts ¶¶ 254-256, 258, ECF No. 141.

## V.    CONCLUSION

Desperate to remove any damaging evidence, Diageo attempts to exclude a survey that included only prospective consumers based on actual bourbon drinking demographics, that used a survey format that has never been excluded when the mark is allegedly well-known, and that showed the entire bottle to respondents instead of an artificial view that does not reflect sophisticated consumers' experience in the marketplace. A survey has never been excluded by this Court or in this circuit on such grounds. This case should certainly not be the first.

Respectfully submitted,

Dated: January 12, 2021          By:    _____

Michael A. Grow, *pro hac vice*
1717 K Street, NW
Arent Fox LLP
Washington, DC 20006
Tel.: (202) 857-6000
Fax: (202) 857-6395
Michael.Grow@arentfox.com

Howard Graff
Eric Biderman
Lindsay Korotkin
Michael Cryan
Arent Fox LLP
1301 Avenue of the Americas, Floor 42
New York, NY 10019
Tel.: (212) 484-3900
Fax: (212) 484-3990
Howard.Graff@arentfox.com
Eric.Biderman@arentfox.com
Lindsay.Korotkin@arentfox.com
Michael.Cryan@arentfox.com

*Attorneys for Defendants/Counterclaim Plaintiffs*
*W.J. Deutsch & Sons Ltd. d/b/a Deutsch Family*
*Wine & Spirits and Bardstown Barrel Selections*
*LLC*

18